AMBASSADOR INSURANCE COMPANY, A CORPORATION
OF THE STATE OF VERMONT AUTHORIZED TO DO
BUSINESS IN THE STATE OF NEW JERSEY, PLAIN-
TIFF-APPELLANT, v. RAFAEL MONTES, ADMINISTRA-
TOR OF THE ESTATE OF MARILYN ORTEGA PEREZ,
DECEASED; RAFAEL MONTES, ADMINISTRATOR *AD
PROSEQUENDUM* OF MARILYN ORTEGA PEREZ, DE-
CEASED; AND JUNA ORTEGA GOMEZ, DEFENDANTS-
RESPONDENTS, AND JOSEPH SATKIN, JOYCE SMITH,
HENRY PITTS AND DRACHIR, INC., A NEW' JERSEY
CORPORATION, DEFENDANTS.

Argued December 12, 1977—Decided June 6, 1978.

478

*Mr. Leonard Rosenstein* argued the cause for appellant (*Messrs. Feuerstein, Sachs and Maitlin,* attorneys).

*Mr. Robert J. Galluccio* argued the cause for respondents (*Messrs. Goodman and Rothenberg,* attorneys).

The opinion of the court was delivered by

SCHREIBER, J. The plaintiff Ambassador Insurance Company instituted this declaratory judgment proceeding seeking an adjudication that its named insured Joseph Satkin was not entitled to coverage under a comprehensive general liability insurance policy. The trial judge's determination of no coverage was reversed by the Appellate Division. We granted certification. 74 *N. J.* 269 (1977).

The assured Joseph Satkin owned, among other properties, two old wooden tenement buildings in Passaic, one at 78 Washington Place, and the other at 80-82 Washington Place. The building at 80–82 Washington Place was a two-and-a-half story duplex four-family house in which 11 to 14 persons resided. The building was in a dangerous condition and had been scheduled for demolition. In the early morning hours of May 11, 1973, a fire broke out in the stairwell of 82 Washington Place. The Passaic Fire Department was alerted at 3:27 a.m. and promptly responded. However, the fire spread rapidly due to an open air draft and took four lives.

Joseph Satkin was tried and convicted of arson, conspiracy to commit arson, and felony murder for having intentionally caused the fire. Rafael Montes, as administrator ad prosequendum and as general administrator, instituted an action against Satkin for the death and injuries of Marilyn Ortega Perez, an infant who perished in the fire. Plaintiff Ambassador Insurance Company refused to defend that action, which has been placed on the inactive trial calendar pending final disposition of this action. In this declaratory judgment proceeding, the plaintiff insurance company has joined Satkin and Rafael Montes, as administrator, as defendants.

At the conclusion of the trial the trial court found that Satkin intended to burn the building. Because of the early morning hour at which the fire was started, nature of the structure, and surrounding facts, the court held it was reasonable to expect that people in the building might be injured. The court concluded that in causing such a fire

the defendant Satkin had completely disregarded the safety of the inhabitants and found that the death and injury were the intended result of an intended act. Therefore coverage under the policy was denied.

The Appellate Division, noting that the plaintiff's liability policy did not contain an express exclusion for the consequences of an intentional wrongdoing, held that such omission was immaterial because public policy prohibits indemnity for the civil consequences of one's intentional wrongdoing. It opined that the guidelines for determining the nonexistence of coverage were either that the insured had a specific intent to inflict the injuries that occurred or that he knew the injuries were substantially certain to follow the performance of the intentional act. The Appellate Division reasoned that since Satkin did not intend to injure or kill anyone, though his act was in wanton and reckless disregard for the safety of those living in the building, the criteria were not met and there was coverage. We agree with the result reached, but not for the reasons stated.

 The plaintiff's policy which was placed in evidence as a joint exhibit provided that:

The company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of

Coverage A, bodily injury or

Coverage B, property damage

to which this Insurance applies, caused by an occurrence and the company shall have the right and duty to defend any suit against the Insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent * * *.

The insurance policy in evidence did not contain a definition of "occurrence," nor a provision which excluded coverage for intentional acts. Both parties have agreed that the factual record is so limited.[1] Accordingly, we adhere to the estab-

[1]At oral argument we had requested a copy of the policy which we understood had been introduced in evidence. The plaintiff sub-

lished principle that we are bound by stipulations of fact. *City of Jersey City v. Realty Transfer Co.*, 129 N. J. Super. 570 (App. Div. 1974) ; *Stalford v. Barkalow*, 31 N. J. Super. 193 (App. Div. 1954). In the policy schedule the limits of liability for bodily injury, coverage A, are $100,000 for each occurrence and $300,000 aggregate. The limits of liability for property damage, coverage B, are $25,000 per occurrence and $25,000 aggregate.

On the face of the policy, plaintiff's obligation to defend the action and pay on behalf of its insured any amount up to the announced limits due on account of the injuries suffered and the death of Marilyn Ortega Perez is obvious. The plaintiff concedes as much for it does not rely upon any exclusionary clause or other pertinent limitation in the policy.[2] Its only defense is that public policy prohibits insurance indemnity for the civil consequences of an insured's intentional wrongdoing.

It has been said that indemnification of a person for a loss or damage incurred as a result of his wilful wrongdoing in violation of a criminal statute is contrary to public policy. 7 *Appleman, Insurance Law and Practice* § 4252 at 5 (1962) ; 1A *Appleman, supra* § 492 (Supp. 1977) ; *Mor-*

---

mitted a policy containing three pages which were not a part of the exhibit in evidence. When the defendant adverted to this ·fact, the plaintiff insurance company replied that the matter should be decided "on the basis of the policy contained in the record." Our discussion herein concerns the factual situation presented.

[2] We note that our dissenting Brother refers to a definition of "occurrence" which is not before us. The plaintiff insurance carrier does not raise any issue as to the word "occurrence" including the specific incident involved. In this connection it may be observed that traditionally, interpretation of policy language is generally construed to effectuate coverage. *Bowler v. Fid. & Cas. Co. of N. Y.*, 53 N. J. 313, 321 (1969) ; *Allen v. Metropolitan Life Ins. Co.*, 44 N. J. 294, 305 (1965) ; *Mazzilli v. Acc. & Cas. Ins. Co. of Winterthur*, 35 N. J. 1, 7 (1961) ; *Kievit v. Loyal Protect. Life Ins. Co.*, 34 N. J. 475, 482 (1961). The meaning of the word "occurrence" includes the happening or taking place of an incident and is not restricted to accidental events.

gan v. *Greater New York Taxpayers Mut. Ins. Ass'n,* 305 N. Y. 243, 112 N. E. 2d 273, 275 (Ct. App. 1953) ; 10 *Couch, Insurance* § 41.663 (2d ed. 1962) ; 44 *Am. Jur.* 2d, *Insurance* § 1411; *Ruvolo v. American Cas. Co.,* 39 N. J. 490, 496 (1963) ; *Lyons v. Hartford Ins. Group,* 125 N. J. *Super.* 239, 244 (App. Div. 1973). Were a person able to insure himself against the economic consequences of his intentional wrongdoing, the deterrence attributable to financial responsibility would be missing. Further, as a matter of moral principle no person should be permitted to allege his own turpitude as a ground for recovery. Accordingly, we have accepted the general principle that an insurer may not contract to indemnify an insured against the civil consequences of his own wilful criminal act. *Ruvolo v. American Cas. Co., supra.*

However, this principle is not to be applied under all circumstances. Certainly it should not come into play when the wrongdoer is not benefited and an innocent third person receives the protection afforded by the insurance. Recovery has been allowed to cover losses occasioned by an intentional act of the insured. In *Fidelity-Phenix Fire Ins. Co. v. Queen City Bus & Transfer Co.,* 3 F. 2d 784 (4th Cir. 1925), the president of a corporation, who owned 25% of the issued and outstanding capital stock, intentionally set fire to a motor bus owned by the corporation and on which he held a mortgage. The fire insurance company was compelled to pay the fire insurance to the corporation to be used for creditors and stockholders other than the wrongdoer. See Annotation, "Fire insurance on corporate property as affected by its intentional destruction by a corporate officer, employee or stockholder," 37 *A. L. R.* 3d 1385 (1971). In another situation a husband and wife owned property as tenants by the entirety and had fire insurance covering the property. The husband intentionally set fire to the property and then committed suicide. It was held that his act of arson did not bar the innocent wife's recovery under the fire insurance

policy. *Howell v. Ohio Casualty Ins. Co.,* 130 *N. J. Super.* 350 (App. Div. 1974).

██ When the insurance company has contracted to pay an innocent person monetary damages due to any liability of the insured, such payment when ascribable to a criminal event should be made so long as the benefit thereof does not enure to the assured. In furtherance of that justifiable end, under most circumstances it is equitable and just that the insurer be indemnified by the insured for the payment to the injured party. In subrogating the insurer to the injured person's rights so that the insurer may be reimbursed for its payment of the insured's debt to the injured person, the public policy principle to which we adhere, that the assured may not be relieved of financial responsibility arising out of his criminal act, is honored. The insurer's discharge of its contractual obligations by payment to an innocent injured third person will further the public interest in compensating the victim. See *Burd v. Sussex Mutual Ins. Co.,* 56 *N. J.* 383, 398 (1970).

This application of subrogation is consonant with its traditional usage as an equitable mechanism to force the ultimate satisfaction of an obligation by the person who in good conscience should pay. See *A. & B. Auto Stores of Jones St., Inc. v. Newark,* 59 *N. J.* 5, 23 (1971); *George M. Brewster & Son v. Catalytic Const. Co.,* 17 *N. J.* 20, 28 (1954). In *Camden Trust Co. v. Cramer,* 136 *N. J. Eq.* 261 (E. & A. 1945), Justice Heher described the principle in the following manner:

Subrogation is a doctrine of purely equitable origin and nature, although it is a right that is now considered as within the cognizance of courts of law in certain circumstances. Since it is an equity, it is subject to the rules governing equities; and it is axiomatic that it will not be enforced where it would be inequitable so to do. It will not be allowed to work injustice to others having equal or superior equities. The right of subrogation must be founded upon an equity just and reasonable according to general principles — an equity that will accomplish complete justice between the parties to the controversy. * * * Subrogation is a device adopted by equity to compel the

ultimate discharge of an obligation by him who in good conscience ought to pay it. [citation omitted] The process is analogous to the creation of a constructive trust, the creditor being compelled to hold his rights against the principal debtor, and his securities, in trust for the subrogee. [*Id.* at 264]

In *Bater v. Cleaver*, 114 *N. J. L.* 346 (E. & A. 1935), Justice Heher also stated:

It is a remedy which is highly favored. The courts are inclined rather to extend than to restrict the principle. Although formerly the right was limited to transactions between principals and sureties, it is now broad and expansive, and has a very liberal application. It is no longer confined to cases of suretyship; it has become more general in its application, the principle being modified to meet the circumstances of the individual case. [*Id.* at 353]

In the casualty insurance field subrogation is most often found when the insurer who has indemnified the insured for its damage or loss is subrogated to any rights that the insured may have against a third party. In the absence of subrogation either the insured would collect twice and be unjustly enriched, or, if the insured were not entitled to double recovery, the third party wrongdoer would go free. *Standard Accident Ins. Co. v. Pellecchia*, 15 *N. J.* 162, 171 (1954).

Insurers have also been permitted to recover from their insureds. Appleman has declared that "[t]he right of subrogation, or more properly called indemnification where sought from its own insured, is enforced where it would be inequitable to deny such remedy." 8 *Appleman, supra* § 4935 at 461 (1973). The same thought was expressed in *Malanga v. Manufacturers Cas. Ins. Co.*, 28 *N. J.* 220 (1958). The defendant insurance company had issued a comprehensive liability insurance policy to a partnership, the named insured. Under the terms of the policy the individual partners were also covered. The policy excluded coverage for damages resulting from an assault and battery committed by the insured. Alfred Malanga, a partner, committed an assault

and battery in the course of the partnership business. The injured third party recovered a verdict against the partnership. The partnership, having paid the judgment, sought reimbursement from the insurance company. The court concluded that the partnership was covered and the insurance company was obligated to reimburse the partnership. However, it was held "[o]f course, Alfred Malanga should not individually benefit by our determination in this case. The issue of his liability to the defendant insurer under its right of subrogation is not in any way affected." *Id.* at 230.[3]

Here the comprehensive general liability insurance policy expressly and clearly obligated the plaintiff insurance company to pay on Satkin's behalf those sums which Satkin was legally indebted to pay as damages because of personal injury to and the death of Marilyn Ortega Perez. The plaintiff insurance company cannot and should not escape from that duty on the ground that the damages were due to its assured's criminal act. However, Satkin should not receive or be entitled to the benefit of the insurer's payment and the insurer's right of subrogation should accomplish that end.

The judgment is affirmed.

PASHMAN, J., concurring. I concur in the result reached by the majority. The conclusion is sound that where a liability insurance policy facially provides coverage for an insured intentional wrongdoer, such coverage should extend to an injured third party, with the insurer subsequently being subrogated to the rights of the third party against the insured. As Justice Schreiber aptly points out, sound public

---

[3] *Miller & Dobrin Furniture Co., Inc. v. Camden Fire Ins. Co. Ass'n*, 55 *N. J. Super.* 205 (Law Div. 1959), held that where an officer, director, and 50% stockholder set fire to the corporation's furniture store, recovery on the policy would be denied. The court relied on the theory that an innocent partner cannot recover on an insurance policy on partnership property wilfully burned by a copartner. We believe this principle is unsound and recovery should not be precluded provided that as a result the wrongdoer does not benefit.

policy is furthered where injured parties are reimbursed, so long as no benefit is received by the tortfeasor. My concurrence is based on uneasiness over whether the majority opinion demonstrates coverage under the policy, given the definition of "occurrence." My conclusion is that there is coverage in spite of that definition.

By the terms of the policy, coverage exists if the insured is liable for damages arising out of an "occurrence," defined as "an accident . . . which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." I find coverage because Satkin did not *intend* to injure the decedent under a proper definition of that term.

The major problem with this case is that the Appellate Division selected an improper standard of intent, and then erroneously applied that standard. The Appellate Division followed *Hanover Insurance Group v. Cameron*, 122 *N. J. Super.* 51, 61 (Ch. Div. 1973), in adopting the definition of intent as used in *Restatement, Torts* 2d, § 8A (1965). 147 *N. J. Super.* 286, 292 (App. Div. 1977).

§ 8A. *Intent*.
The word "intent" is used throughout the Restatement of this Subject to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it.

The Appellate Division also cited the following part of *Restatement, Torts* 2d, § 8A, comment b:

If the actor knows that the consequences are certain or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.

If I believed that this were indeed a proper definition of intent in the context of liability insurance, my conclusion would be that the injuries resulting from Satkin's arson were intentional and not an occurrence under this policy. Surely, one who starts a fire in an old multi-storied wood

frame building at 3 A.M., directly under the main stairwell, without warning any of the inhabitants, should be held to be substantially certain that some of these persons would be seriously injured or killed. The Appellate Division's conclusion that Satkin's act did not meet the objective standard of intent inherent in the *Restatement* strains credulity.

Moreover, the trial court found as a matter of fact that Satkin could not have said in his mind, as he did this act, "[T]hey'll all get out; there's a fire escape." The judge added that

It is not logical, nor can I draw a reasonable inference that this is what he said or this is what he thought.

I am of the opinion that the natural and logical consequence of his act is what we have resulted and what was before us. I think this case, on its facts — strictly on its facts — is different than the man who throws a firecracker in a room and intends merely to scare.

\* \* \* \* \* \* \* \*

I think this case turns on these particular facts and to that extent, I find that he meets the test as set forth in *Lyons* [*Lyons v. Hartford Insurance Group*, 125 *N. J. Super.* 239 (App. Div. 1973)], that is, the intended result of an intended act and a judgment is to entered [sic] on behalf of the plaintiff.

The finding that Satkin knew with substantial certainty that his act of arson would injure his tenants is amply supported by the evidence, and is unassailable under *State v. Johnson*, 42 *N. J.* 146, 161–162 (1964). Under a principled application of the *Restatement* standard, the Appellate Division could do nothing but affirm the denial of coverage at trial.

However, I reject the *Restatement* standard as a definition of intent in the liability insurance field. It is really no different from the rule that a tortfeasor intends the natural and probable consequences of his acts, a standard which has been roundly rejected in liability insurance policy cases. *See Continental Western Insurance Co. v. Toal*, 244 *N. W.* 2d 121, 125 (Minn. 1976); *Lumbermens Mutual Insurance Co. v. Blackburn*, 477 *P.* 2d 62, 66 (Okl. 1970); *Grange*

*Mutual Cas. Co. v. Thomas,* 301 *So.* 2d 158, 159 (Fla. App. 1974); *Cloud v. Shelby Mutual Ins. Co.,* 248 *So.* 2d 217, 218 (Fla. App. 1971).

The proper standard of intent for liability insurance cases was announced in *Lyons v. Hartford Insurance Group,* 125 *N. J. Super.* 239, 247 (App. Div. 1973), certif. den. 64 *N. J.* 322 (1974), as whether the injury was the intended result of an intentional act. In *Lyons,* an off-duty police officer whose conduct after a long drinking bout caused him to be assaulted, shot and killed a man. He claimed that he merely wanted to fire a warning shot and that the revolver went off prematurely.

The policy had an exclusion clause which prevented coverage for an injury expected or intended from the standpoint of the insured. The Appellate Division injected this clause into the case for the first time, and reversed the trial court's dismissal of the insured's declaratory judgment action concerning coverage. The Appellate Division used the following test to determine coverage:

> Thus, the distinction between intended and unintended results of intentional acts is well recognized. The trial court did not apply this principle. The oral opinion below can be construed as holding that if Lyons intended to fire without any specific intent to cause death or bodily harm, coverage did not exist. Such a principle is at war with the authorities discussed here. The short of it is, if Lyons intended to maim or kill Berger he has no coverage. If his intent was, as he says, to fire a warning shot, but he unintentionally fired prematurely, coverage exists.
>
> [*Lyons v. Hartford Insurance Group, supra* at 247]

Under *Lyons, Satkin* should be charged with intent to injure his tenants only if that was his subjective desire. This is the correct standard for liability insurance cases. Since one purpose of such insurance is to protect injured third parties, as between the liability insurer of a culpable actor and an innocent third party it is the better policy to place the risk of loss with the insurer where intent to injure is unclear.

Moreover, the standard which I advocate is the prevailing one.

The courts have generally held that injury or damage is "caused intentionally" within the meaning of an "intentional injury exclusion clause" if the insured has acted with the specific intent to cause harm to a third party, with the result that the insurer will not be relieved of its obligations under a liability policy containing such an exclusion unless the insured has acted with such specific intent. Under this view, it is not sufficient that the insured's intentional, albeit wrongful, act has resulted in unintended harm to a third person; it is the harm itself that must be intended before the exclusion will apply. There is, however, some authority for the proposition that such a clause will operate to relieve a liability insurer of its duty to indemnify an insured whose intentional act has caused harm to a third person where the nature or character of the act is such that an intent to cause harm is thereby inferred as a matter of law.

> [Annotation, "Liability Insurance: Specific Exclusion of Liability for Injury Intentionally Caused by Insured," 2 *A. L. R.* 3d 1238, § 2 at 1241 (1965), *see also* 44 *Am. Jur.* 2d *Insurance* § 1411 n. 5 at 259, 45 *C. J. S. Insurance* § 772 n. 53–55 at 801–802; footnote omitted]

The leading decision for the majority view is *Lumbermens Mutual Insurance Co. v. Blackburn, supra,* where the Court held that the intentional throwing of a hard object by insured's son, which injured plaintiff, was not within a policy exclusion where the trial court found that no injury was actually intended. In *Caspersen v. Webber,* 298 *Minn.* 93, 213 *N. W.* 2d 327 (1973), the court also held that an injury was not caused intentionally within the meaning of an intentional injury exclusion clause. The insured had deliberately pushed aside plaintiff in entering a coat checkroom but did not desire or intend her resulting fall and back injury. To the same effect is *Hawkeye Sec. Insurance Co. v. Shields,* 31 *Mich. App.* 649, 187 *N. W.* 2d 894, 901 (1971), which held that the insurer will only avoid liability if the insured not only intended the act which led to the injury, but also intended to cause bodily injury to the injured party. *See also Putnam v. Zeluff,* 372 *Mich.* 553, 127 *N. W.* 2d 374

(1964); *Smith v. Moran*, 61 *Ill. App.* 2d 157, 209 *N. E.* 2d 18 (1965) (insurer is liable for the unintended result of an intentional act). The holding in *Lyons, supra,* can be most readily interpreted as following these cases.

Although a few cases permit intent to harm to be found as a matter of law, *see Continental Western Insurance Co. v. Toal, supra,* 244 *N. W.* 2d at 125–126, nearly all such cases have involved an assault or some analogous act. *See* 2 *A. L. R.* 3d 1238, *supra,* § 4b at 1245 and supplement. An example of this view is found in *Oakes v. State Farm,* 137 *N. J. Super.* 365 (App. Div. 1975).

In the liability trial the jury expressly found that Oakes was guilty of assault and battery which. under the court's instruction here, amounted to a determination that Oakes intended to injure Appleton. It follows that coverage is excluded. Indeed to permit coverage of an assault and battery would be against public policy. *See Malanga v. Manufacturers Cas. Ins. Co.,* 28 *N. J.* 220, 225 (1958).

Satkin's act was not in the nature of an assault, and is thus not controlled by these cases.

For a tortfeasor to be charged with intent to injure for purposes of a liability insurance policy, the majority rule requires that he have an actual subjective desire to injure a party. It is apparent that this rule cannot be harmonized with the Restatement test. I fully agree with the prevailing view that negligence standards of foreseeability do not govern the law of liability insurance exclusions. If subjective intent to injure is necessary, then Satkin lacked intent. The Appellate Division reached a result in keeping with the majority rule, but also endorsed a definition of intent which would probably negate that rule. If normal tort/negligence standards of foreseeability are inappropriate in the context of liability insurance coverage, then the *Restatement, Torts* 2d definition of intent is similarly unsuited for this area.

The whole purpose behind Satkin's act of arson was to defraud the insurance company and obtain payment for the value of his property. He never desired that his tenants

suffer injury or death. While he certainly displayed a callous disregard for their safety, he did not want to see them harmed by his act. Thus, Satkin did not "expect or intend" the deaths of his tenants in the subjective sense that is required for his act to be excluded from the definition of "occurrence." He was covered for the injuries caused by his despicable act, but is also liable to the insurer as the subrogee of an injured third party.

While the issue need not be reached here, it is my opinion that the so-called public policy against covering an insured for his intentional torts should be reexamined. This is particularly so where, as here, a subrogation theory exists so that the tortfeasor can in no way profit from his intentional wrongful act. With the prospect of criminal sanction and the spectre of civil liability despite coverage facing any wrongdoer, there is little reason to deny coverage which would protect the innocent injured party.

Justice HANDLER joins in this opinion.

CLIFFORD, J. dissenting. By making the proceeds of a comprehensive general liability insurance policy available to compensate the estate and next-of-kin of a murder victim who perished in an intentionally set fire, the Court has devised a way to reach the "deep pockets." In achieving this remarkable result the majority obligates other insured property owners to bar the losses intentionally inflicted by a criminal merely because that criminal likewise happened to carry liability insurance on his property. In so doing the Court has disregarded the specific provisions of the policy in question as well as long-established public policy considerations. The law of insurance has thereby been turned on its head. I dissent.

On May 11, 1973 Marilyn Ortega Perez and three others died in a fire on Washington Place, Passaic. The owner of the property, defendant Joseph Satkin, was convicted of felony-murder on an indictment charging him with having

intentionally caused the fire. Suit was instituted against Satkin for Ms. Perez's injuries and damages occasioned by the fire and the resultant pecuniary loss of her next-of-kin. Ambassador Insurance Company, Satkin's liability insurance carrier on this and at least forty-nine other pieces of his income-producing property, refused to defend Satkin and denied coverage. This declaratory judgment action tests the company's decision in that regard.

In finding coverage the Court reasons that on the face of the policy the company's obligation to defend and pay on behalf of its insured is "obvious;" that the policy contains no exclusion for the insured's intentional wrongdoing, and in fact constitutes an undertaking "to pay an innocent person monetary damages due to any liability of the insured, whether or not resulting from the insured's wilful criminal act," *ante* at 483–484; and that the public policy principle against insurance coverage for intentional wrongdoing is vindicated by enforcing the carrier's payment to the injured party and permitting the insurer thereafter to be subrogated to the injured person's rights against the insured. On each supporting ground this reasoning fails.

First, the policy does *not,* on its face, provide coverage. In setting forth the policy provisions, *ante* at 481–482, the majority has quoted only so much of the insurance contract as spells out an obligation on the part of the company to "pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of [bodily injury or property damage] * * * caused by an *occurrence* * * *" (emphasis added). Conspicuously absent from the majority's analysis, however, is any discussion of the definition of "occurrence," which the policy defines as "an accident * * * which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured * * *."[1] That the fire in question was not,

---

[1] In complying with the trial court's request for a copy of the policy issued by Ambassador to Satkin, counsel for the carrier failed

under any meaning of the word, an accident, seems beyond question. Nor is there any doubt that the bodily injury resulting here was "intended." The *Restatement (Second) of Torts* § 8A (1965) provides that

[t]he word "intend" is used throughout the Restatement of this subject to denote that the actor desires to cause consequences of his act, *or that he believes that the consequences are substantially certain to result from it* (emphasis supplied).

Applying this definition in the instant case, see *Hanover Insurance Group v. Cameron,* 122 *N. J. Super.* 51, 61 (Ch. 1973), there can be little question that Satkin "intended" to cause the victim's bodily injuries. By burning one of his rented dwelling houses at three o'clock in the morning, Satkin undoubtedly knew that injuries were substantially certain to follow his intentional act. So while there is no specific exclusion for the insured's intentional acts, neither is there coverage for Satkin's satanic conduct in this case. See, *e. g., Chemlec Midwest Service, Inc. v. Insurance Co. of North America,* 288 *F. Supp.* 763, 769 (W. D. Wis. 1968) (dicta) (applying New Jersey law) (injury to property "caused by accident" means injury to property not wilfully or inten-

---

to include the page containing "definitions;" therefore, the trial court did not have the benefit of the entire policy. Likewise, counsel have not presented argument based on the definition of "occurrence." At oral argument we inquired about the policy's definition of "occurrence," and specifically requested and thereafter received the complete policy. While the Court chooses to ignore the definition section, and counsel for Ambassador, after submitting the full policy, asks (inexplicably) that we "disregard the policy forwarded" to us after oral argument, I do not understand how we can properly — or intelligently — decide this case without application of the policy's definition of "occurrence." I would accept as part of the record so much of the insuring agreement filed with us as contains the definitions of terms used elsewhere in the policy, see *R.* 2 :5-4(a), or at the very least give the attorneys the opportunity to present any argument relating to the definition of occurrence as they might wish to make. See *Dresner v. Carrara,* 69 *N. J.* 237, 243 (1976) ; *cf. U. S. Trust Co. of N. Y. v. State,* 69 *N. J.* 253, 257 (1976), rev'd on other grounds, 431 *U. S.* 1, 97 *S. Ct.* 1505, 52 *L. Ed.* 2d 92 (1977).

tionally inflicted but caused by negligence of insured); *Anton v. Fidelity & Casualty Co. of New York,* 117 *Vt.* 300, 91 *A.* 2d 697 (1952) ("bodily injury * * * caused by accident" does not include coverage for wilful acts of the insured); *Weis v. State Farm Mutual Auto Insurance Co.,* 242 *Minn.* 141, 64 *N. W.* 2d 366, 368 (1954) (where policy provided coverage only for injuries "caused by accident," no coverage where insured intentionally drove into another car).

Even without resort to the policy definition of "occurrence," it seems to me that the same meaning — an accident resulting in unexpected or unintended damage — should be ascribed to that word in its present context. It should convey such meaning as ordinarily would be expected within the confines of the instrument — here a liability insurance policy — in which it is used. Consulting the dictionaries, we find "occurrence" defined as "something that takes place; esp.: something that happens unexpectedly and without design" (Webster's Third New Int'l Dictionary, 1971); or as "a coming or happening; any incident or event, especially one that happens without being designed or expected" (Black's Law Dictionary, rev. 4th ed., 1968). Indeed, this common-sense interpretation of "occurrence" as being virtually synonymous with "accident" is supported by the case law. See, *e. g., Deodato v. Hartford Insurance Co.,* 143 *N. J. Super.* 396, 402 (Law Div. 1976) ("an occurrence need not be a sudden event, but may be a process, *as long as the incident or event is not designed or expected*") (emphasis added); see also *Truck Insurance Exchange v. Rohde,* 49 *Wash.* 2d 465, 303 *P.* 2d 659 (1956).

Second, even if the policy in question can somehow be read to provide coverage in its insuring agreement, there is an *implied* exclusion for the situation in which the insured "torches" a residential dwelling. This implied exclusion is based not on public policy but on the expectancies of the parties to the insurance contract. Professor Robert E. Keeton. in *Insurance Law* (1971) § 5.3(a) at 278–79, explains the theory as follows:

The phrase "implied exception" as used in insurance law ordinarily refers to a basis for an insurer's non-liability that is not expressed anywhere in the contract but is said to be implicit in the nature of the agreement and the circumstances to which it applies. Common examples of implied exceptions are the rules denying recovery under fire insurance for losses caused by "friendly fires," under marine insurance for losses caused by ordinary deterioration of goods or by inherent vice, and under liability insurance for losses caused intentionally by the insured.

An examination of the whole array of implied exceptions recognized in insurance law reveals that most of the losses to which implied exceptions apply can be explained as illustrations of one or the other of two principles. First, insurance contracts do not ordinarily cover economic detriment of a type occurring so regularly in relation to an insured enterprise or activity that it is commonly regarded as a cost rather than a risk of that activity or enterprise. Second, insurance contracts do not cover economic detriment that is not fortuitous from the point of view of the person (usually the insured) whose detriment is asserted as the basis of the insurer's liability. For example, a loss is not fortuitous in this sense if caused intentionally by that person.

Quite plainly the "economic detriment" here (liability translated into money damages) is not fortuitous from the point of view of the author of this tragedy, Satkin; and it is his detriment that is "asserted as the basis of the insurer's liability." To suggest that in fact the person whose detriment we are concerned with is Ms. Perez's representative and that as to the decedent this conflagration was entirely fortuitous misses the point. That approach skips an essential step in the analysis. The issue here is whether in the first instance coverage is to be afforded this wrongdoer for his intentional act and *not* whether, if coverage is afforded, Satkin can thereafter be made to answer over to his liability insurance carrier by application of subrogation principles. Without even considering whether, as surely it appears to, the majority's analysis embraces coverage for punitive damages, I would hold that the expectancies of the parties to this insurance contract were that any intentional tort would be excluded from coverage.

But it is on the third ground asserted by the Court in support of its conclusion — the public policy dimension — that today's decision so plainly departs from established law. The Court concedes that as a general rule it would violate public policy to allow indemnification of a person for loss or damage resulting from his wilful wrongding in violation of a criminal statute, reasoning however that this principle is inapplicable when "* * * the wrongdoer is not benefited and an innocent third person receives the protection afforded by the insurance." *Ante* at 483. In support of this proposition, the Court relies on *Fidelity-Phenix Fire Insurance Co. v. Queen City Bus & Transfer Co.*, 3 *F*. 2d 784 (4th Cir. 1925) and *Howell v. Ohio Casualty Insurance Co.*, 130 *N. J. Super.* 350 (App. Div. 1974). Those cases are clearly distinguishable and afford no support whatsoever for the majority's position, inasmuch as in each the party recovering from the insurance carrier was an *express* beneficiary of a fire insurance policy issued to the injured party. *Fidelity-Phenix Fire Insurance Co. v! Queen City Bus & Transfer Co., supra,* 3 *F*. 2d at 785 (where corporation is express beneficiary of fire insurance policy, it can recover proceeds when officer of corporation intentionally burns covered property); *Howell v. Ohio Casualty Insurance Co., supra,* 130 *N. J. Super.* at 353 (where wife is express beneficiary of fire insurance policy, wife can recover proceeds of insurance policy when husband intentionally burns covered property). These cases were rightly decided and reflect a sound judicial approach: there is unquestionably no public policy reason to prevent a person from obtaining fire insurance protection against the consequences of the intentional criminal acts of third parties.

The instant case, however, does not represent an attempt by a victim of an intentional wrongdoer to recover the proceeds of a fire and accident policy *issued to the victim* and providing coverage against the intentional criminal acts of third parties. Rather, it involves an effort by a victim to recover the proceeds of a liability policy *issued to an insured* (the wrongdoer) and providing coverage for the consequences

of his actions. New Jersey has consistently recognized that it would violate public policy to permit the proceeds of a liability policy issued to an insured to be paid to the innocent victims of an insured's intentional criminal conduct. *Malanga v. Manufacturers Casualty Insurance Co.*, 28 *N. J.* 220, 225 (1958) (violative of public policy to indemnify an insured for a loss incurred as a result of an assault and battery committed by insured) ; *Ruvolo v. American Casualty Co.*, 39 *N. J.* 490, 496 (1963) (it would be violative of public policy to indemnify an insured for a loss incurred as a result of intentional killing) ; *Lyons v. Hartford Insurance Group*, 125 *N. J. Super.* 239, 244–45 (App. Div. 1973) (violative of public policy to allow insurance indemnification for the civil consequences of one's intentional wrongdoing) ; *Oakes v. State Farm Fire & Casualty Co.*, 137 *N. J. Super.* 365, 368 (App. Div. 1975) (violative of public policy to indemnify an insured for a loss incurred as a result of an assault and battery).

There is no persuasive reason offered for departing from the doctrine enunciated in the foregoing cases. That course completely loses sight of one of the guiding purposes of insurance: the wide distribution of *accidental* rather than *intentional* losses. The result here is that other insured property owners are required to shoulder the costs incurred as a result of the intentional misconduct of this named insured owner of the property in question. Sound insurance principles and salutary policy considerations are thereby offended.

I would reverse the judgment of the Appellate Division and reinstate the trial court's determination of no coverage.

PASHMAN and HANDLER, JJ., concurring in the result.

*For affirmance*—Chief Justice HUGHES and Justices SULLIVAN, PASHMAN, SCHREIBER and HANDLER—5.

*For reversal and reinstatement of trial court's determination*: Justice CLIFFORD—1.