292 N.J. Super. 349 (1996)
678 A.2d 1143
PRINCETON INSURANCE COMPANY, PLAINTIFF-APPELLANT,
v.
PRASERT CHUNMUANG, M.D., DEFENDANT, AND JUNE DAVIS, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 29, 1996.
Decided July 18, 1996.
*350 Before Judges PRESSLER, KEEFE and KOLE.
Leonard Rosenstein argued the cause for appellant (Hurley & Vasios, attorneys).
Lawrence Z. Farber argued the cause for respondent (Breslin and Breslin, attorneys; Karen Boe Gatlin, on the brief).
The opinion of the court was delivered by KOLE, J.A.D. (retired and temporarily assigned on recall).
Plaintiff, Princeton Insurance Company (Princeton), appeals from the entry of summary judgment in favor of defendant, June *351 Davis, in this declaratory judgment action, in which the Law Division found Princeton liable for the compensatory damages assessed against its insured, defendant Prasert Chunmuang, M.D., a gynecologist. The issue to be decided is whether Princeton must cover Dr. Chunmuang under its malpractice insurance policy and pay compensatory damages for the emotional distress sustained by Davis resulting from Dr. Chunmuang's sexual assault on Davis during the course of a gynecological examination. We conclude that the policy covers Dr. Chunmuang for such damages and that Princeton must make payment thereof to Davis. We affirm the judgment under review.
Davis instituted suit against Dr. Chunmuang alleging medical malpractice, negligent infliction of emotional distress, intentional infliction of emotional distress, sexual assault, and assault and battery, stemming from an examination conducted by Dr. Chunmuang in his office on an unspecified date in October 1992.[1] Davis sought compensatory and punitive damages.
Dr. Chunmuang was apparently served with the complaint but did not file an answer, and a default was entered against him. The Law Division also ordered substituted service on Dr. Chunmuang through his insurer Princeton. Princeton elected not to answer the complaint on his behalf. Instead, Princeton instituted this declaratory judgment action seeking a determination that it did not cover Dr. Chunmuang for the damages claimed by Davis. Davis was named as an interested party and answered the complaint. Dr. Chunmuang did not answer.
After this action was instituted, Davis arranged for a proof hearing on the default that she had taken against Dr. Chunmuang. Princeton received notice of the hearing and appeared solely for *352 the purpose of having Davis accept service of its declaratory judgment complaint.
Princeton did not participate in the default hearing but agrees to be bound by the Law Division judge's findings of fact and conclusions of law. Davis concedes that she is also bound by those findings. At the default proof hearing, Davis testified that, on an unspecified date in November 1992, she visited Dr. Chunmuang's office.[2]
The purpose of the visit was to have a gynecological examination, since she was experiencing cramping and had not had a menstrual cycle. Davis, who was seventeen years old at the time, had never had a gynecological examination. She said that Dr. Chunmuang started the examination of her vaginal area with an instrument but then began using his fingers and twisting his hand as he did so. During the examination, the doctor asked her whether she had a boy friend and whether she had sex. When Davis said that she had not had sex, the doctor asked her why she did not. Davis developed a feeling that the doctor was going beyond what was necessary to examine her. Consequently, she attempted to withdraw from his touch, but he kept pulling her down on the table toward him. This happened three times over the course of five to ten minutes. When the vaginal examination was completed, Dr. Chunmuang examined her breasts. In doing so, the doctor kept rubbing her breasts. Davis knew from what she had read about breast examinations that the type of rubbing the doctor was doing was not normal. She became "very upset" during the examination.
Although Dr. Chunmuang wanted Davis to return for another examination in a few weeks, Davis knew that she would never return. She said that the examination made her "feel dirty" and "kind of ashamed." She testified that she currently felt "depressed or whatever" when she thinks about having another *353 gynecological examination, and, consequently, has not been examined again. At the time of the proof hearing, Davis was almost twenty-one years old.
The record of the proof hearing also revealed that, shortly after the examination, Davis gave a statement to the county prosecutor. Other patients of Dr. Chunmuang apparently had similar experiences and also reported their experiences to the prosecutor. Dr. Chunmuang was indicted on several counts, including the complaint lodged by Davis. Thereafter, Dr. Chunmuang entered into a plea agreement, wherein he agreed to plead guilty to several counts of the indictment. The count involving Davis, however, was not one of the counts to which he pled guilty.
The Board of Medical Examiners also presented a verified complaint against Dr. Chunmuang based upon five specific incidents in which he performed gynecological examinations on five different patients, including Davis, for the purpose of "personal gratification." As a result of the administrative hearing concerning the revocation of Dr. Chunmuang's license, at which Dr. Chunmuang testified, the Board revoked his license to practice medicine in New Jersey. In doing so, the Board adopted the administrative law judge's finding that "Dr. Chunmuang touched and rubbed the vaginas and breasts of four adult female patients in a sexual manner or for sexual purposes, without medical purpose[.]" Although Davis did not testify at the license suspension hearing, she offered the findings of the Board at the default hearing to prove Dr. Chunmuang's liability as to her.
Judge Mandak, who presided over the proof hearing, made the following finding:
The Court has considered the testimony of Ms. Davis with respect to the incident with Dr. Chunmuang and is satisfied that that testimony reflects activity and action on the part of the doctor, which were not only a deviation from accepted standards but clearly a criminal act in the sense of amounting to a sexual assault.
Although "at a loss a little bit as to what the compensatory damages should be," apparently in light of the sparse testimony on the subject, the judge awarded compensatory damages of $50,000 and punitive damages in the same amount.
*354 The summary judgment motion in this declaratory judgment action was heard by another Law Division judge, Judge McVeigh. She had before her the transcript of the proof hearing, the Princeton insurance policy, and the briefs of the parties. She noted that Judge Mandak had found both an act of medical malpractice and a criminal act resulting from the examination of Davis. Judge McVeigh found it significant, in the context of the coverage issue, that Judge Mandak had awarded compensatory damages for the malpractice and punitive damages for the criminal act. Consequently, she concluded that there was coverage for the compensatory damages under the terms of the Princeton policy. Princeton has appealed from that determination.
The question of coverage must necessarily begin with an analysis of the terms of the policy. In the indemnity section of the policy Princeton agreed, in pertinent part, to:
pay all amounts up to the limit of liability which you become legally obligated to pay as a result of injury ... caused by a "medical incident" arising out of your supplying ... professional services.
The exclusion section of the policy, however, provided that the
insurance does not apply for:
(a) injury resulting from your performance of a criminal act.
A "medical incident" is defined in the policy as "any act ... in the furnishing of the professional medical ... services by you[.]"
We construe the Princeton policy to mean that there will be coverage for "injury" resulting from "professional services" unless the "injury" results from a "criminal act." Davis does not dispute the finding that Dr. Chunmuang's conduct was criminal. However, she maintains that because the sexual assault took place during the course of a consented to gynecological examination, Dr. Chunmuang's injurious acts resulted from "professional services," as defined in the policy. Specifically, she argues that the "services performed and the assault are intertwined and inseparable." We agree.
The policy terms here involved have not been construed in New Jersey.
*355 We agree with the reasoning of St. Paul Fire & Marine Insurance Company v. Asbury, 149 Ariz. 565, 720 P.2d 540 (Ct.App. 1986) on this issue. There the court held that a physician's intentional and improper manipulations during a gynecological examination were covered by his professional liability policy. The court explained its holding as follows:
The claims of Dr. Asbury's patients that he manipulated their clitorises while performing routine gynecological examination, if true, was tortious conduct committed while providing professional services and covered by his insurance policy. Most of the cases cited to us by St. Paul are distinguishable because the tortious sexual abuse of the patient was not intertwined with and inseparable from the services provided.
[Id., 720 P.2d at 542.]
The holding in Asbury is supported in other jurisdictions. See St. Paul Fire And Marine Insurance Company v. Shernow, 222 Conn. 823, 610 A.2d 1281, 1285 (1992); Vigilant Insurance Co. v. Kambly, 114 Mich. App. 683, 319 N.W.2d 382 (1982); Cotton v. Kambly, 101 Mich. App. 537, 300 N.W.2d 627 (1981). However, it has been considered to be the minority view by one court. Snyder v. Major, 789 F. Supp. 646, 650 (S.D.N.Y. 1992).
The Asbury court, in rejecting the insurance carrier's argument that the result reached would be against public policy, held that the public policy of the state favored protecting the interests of injured parties, the innocent victims, saying:
Finally, St. Paul asks us to reverse the trial court because affirmance would be against public policy and provide indemnification of a physician for performing antisocial, illegal, immoral and unprofessional acts. We disagree and hold that the public policy of Arizona favors protecting the interests of injured parties. As the court stated in Vigilant Insurance v. Kambly, supra:

"Initially, it is unlikely that the insured was induced to engage in the unlawful conduct by reliance upon the insurability of any claims arising therefrom or that allowing insurance coverage here would induce future similar unlawful conduct by practitioners. Not does it appear that the policy was obtained in contemplation of a violation of the law.... Furthermore, coverage does not allow the wrongdoer unjustly to benefit from his wrong. It is not the insured who will benefit, but the innocent victim who will be provided compensation for her injuries ... In this instance, there is great public interest in protecting the interests of the injured party."
[Id., 720 P.2d at 542 (citations omitted).]
*356 It should be noted that the insurance policy in Asbury did not contain a provision excluding coverage for criminal acts.
New Jersey insurance law likewise is committed to the principle of protecting injured innocent victims by finding coverage in their favor, notwithstanding the fact that to insure the type of conduct of the insured may be against public policy or expressly excluded by the insurance policy itself  e.g., a criminal or intentional act. See Ambassador Insurance Company v. Montes, 76 N.J. 477, 388 A.2d 603 (1978); Burd v. Sussex Mutual Insurance Company, 56 N.J. 383, 267 A.2d 7 (1970). This is particularly so, where, as here, the conduct is otherwise within the coverage of the policy and is intertwined with and inseparable from the prohibited conduct. See also, St. Paul Fire & Marine Ins. Co. v. Mitchell, 164 Ga. App. 215, 296 S.E.2d 126 (1982) (the liability policy protects not only the insured but also the injured person).
Accordingly, we find no basis for a ruling that the presence of an exclusionary criminal conduct provision here suffices to distinguish this case from Asbury and the cases that follow it; for that provision is simply an expression of this state's public policy in accepting the general principle that an insurer may not contract to indemnify an insured against the civil consequences of his own wilful criminal act. Ambassador, supra, 76 N.J. at 483, 388 A.2d 603. That exclusionary provision is not without meaning, however. It serves to highlight the inapplicability of the policy where the criminal conduct is not an inseparable part of providing professional services by the insured physician  e.g., rape, serious assault, robbery.
Whether the exclusion is based on an express provision or on the public policy prohibition of insurance against criminal conduct, the insurer bears a substantial burden of demonstrating that the loss falls outside the scope of coverage. United Rental Equip. Co. v. Aetna Life & Cas. Ins. Co., 74 N.J. 92, 99, 376 A.2d 1183 (1977). We conclude that, under the facts of this case, the insurer has not met that burden.
*357 The Burd case, supra, involved a clause excluding coverage for bodily injury "caused intentionally by or at the direction of the insured." Burd's home owners policy provided comprehensive personal liability coverage. The issue was whether the policy covered the liability incurred by Burd when he inflicted shotgun wounds on one D'Agostino. The shooting incident led to Burd's conviction for atrocious assault and battery. D'Agostino's civil tort complaint against Burd charged both a negligent and intentional firing of a loaded gun by Burd. The carrier refused to defend the civil suit by reason of the exclusion. Burd defended with his own counsel. D'Agostino was awarded $8,500 against Burd in that action. Burd sued the carrier to recover the amount of the award and costs in defending the tort action. In reversing a summary judgment in favor of Burd, the Court held that the carrier was entitled to try the issue whether "in truth the injuries inflicted on D'Agostino were within the exclusion and hence beyond the policy coverage." 56 N.J. at 396, 267 A.2d 7. But it held that the carrier was not entitled to judgment as a matter of law by reason of the fact that Burd had been convicted of atrocious assault and battery. It said:
... D'Agostino was made a party to this suit, although we do not know what position, if any, he took. If D'Agostino asserts a claim against the carrier, he could not be concluded by the judgment of conviction. By statute, N.J.S.A. 17:28-2, an injured claimant has an interest in a liability policy ... and is entitled to be heard as to coverage.... A claimant's interest is derivative of the insured's (absent a statute providing otherwise) and it is therefore reasonable to admit the judgment of conviction in his suit for whatever evidential worth it may have. But the claimant may not be estopped by a judgment entered in a proceeding begun after he was injured if he was not a party to it. Hence, D'Agostino is not precluded by the criminal conviction ...
But other values are involved in the insurance controversy. The exclusion of intentional injury from coverage stems from a fear that an individual might be encouraged to inflict injury intentionally if he was assured against the dollar consequence. Ruvolo v. American Casualty Co., 39 N.J. 490, 496, 189 A.2d 204 (1963). Pulling the other way is the public interest that the victim be compensated, and the victim's rights being derivative from the insured's, the victim is aided by the narrowest view of the policy exclusion consistent with the purpose of not encouraging an intentional attack. And the insured, in his own right, is also entitled to the maximum protection consistent with the public purpose the exclusion is intended to serve. Accordingly, we held in Ruvolo, 39 N.J. at 498, 189 A.2d 204 *358 that the concept of insanity relevant to the exclusion clause of a liability policy was more expansive than the concept of insanity accepted in the defense of a criminal charge.
The burden is the carrier's to bring the case within the policy exclusion.... Thus, as to intoxication, although in the criminal trial the jury was instructed that it was the defendant's burden to prove and persuade that he was so intoxicated as not to be able to form the intent to commit the atrocious assault and battery, here the burden would be the carrier's to prove and persuade that the injuries were within the exclusion, i.e., that the insured, notwithstanding his intoxication, formed an intent to injure D'Agostino and fired the gun to that end. The allocation of the burden of persuasion being different, the criminal conviction, although admissible for whatever value a jury may give it, cannot be held to conclude the case against the insured.
[56 N.J. at 397, 398, 399, 267 A.2d 7 (citations omitted).]
In Ruvolo v. American Cas. Co., 39 N.J. 490, 498, 189 A.2d 204 (1963), the Court said that "the insured is entitled to protection to the full extent that any reasonable interpretation [of the exclusionary clause] will permit."
In Ambassador Insurance Company v. Montes, supra, which did not involve an exclusionary clause relating to intentional or criminal acts, Satkin, the insured in a comprehensive general liability policy, had been convicted of arson and felony murder for having intentionally caused a fire, which took four lives. The carrier refused to defend an action against Satkin on behalf of one of the decedents, Perez, whose estate administrator was Montes. It brought a declaratory judgment proceeding in which both Satkin and Montes were defendants. The Appellate Division, noting that the policy did not contain an express exclusion for the consequences of intentional wrongdoing, held that such omission was immaterial because public policy prohibited indemnity for the civil consequences of one's intentional wrongdoing. It held that since Satkin did not intend to injure or kill anyone, the criteria for such a public policy exclusion from coverage had not been met and there was coverage. It found such criteria to be a specific intent to inflict the injuries that occurred or knowledge that the injuries were substantially certain to follow performance of the intentional act. The Supreme Court agreed with the result reached, but not for the reasons stated.
*359 The Court found the carrier's obligation  to defend and pay on behalf of the insured the amounts due on account of the injuries and death of Perez  was obvious on the face of the policy. It then addressed the sole argument of the carrier: that public policy prohibits insurance indemnity for the civil consequences of an insured's intentional wrongdoing. In rejecting this argument, the Court said:
[We] have accepted the general principle that an insurer may not contract to indemnify an insured against the civil consequences of his own wilful criminal act ...
However, this principle is not to be applied under all circumstances. Certainly it should not come into play when the wrongdoer is not benefitted and an innocent third person receives the protection afforded by the insurance. Recovery has been allowed to cover losses occasioned by an intentional act of the insured.
....
When the insurance company has contracted to pay an innocent person monetary damages due to any liability of the insured, such payment when ascribable to a criminal event should be made so long as the benefit thereof does not enure to the assured. In furtherance of that justifiable end, under most circumstances it is equitable and just that the insurer be indemnified by the insured for the payment to the injured party. In subrogating the insurer to the injured person's rights so that the insurer may be reimbursed for its payment of the insured's debt to the injured person, the public policy principle to which we adhere, that the assured may not be relieved of financial responsibility arising out of his criminal act, is honored. The insurer's discharge of its contractual obligations by payment to an innocent injured third person will further the public interest in compensating the victim. See Burd v. Sussex Mutual Ins. Co., 56 N.J. 383, 393, 267 A.2d 7 (1970). .. .
Here the comprehensive general liability insurance policy expressly and clearly obligated the plaintiff insurance company to pay on Satkin's behalf those sums which Satkin was legally indebted to pay as damages because of personal injury to and the death of Marilyn Ortega Perez. The plaintiff insurance company cannot and should not escape from that duty on the ground that the damages were due to its assured's criminal act. However, Satkin should not receive or be entitled to the benefit of the insurer's payment and the insurer's right of subrogation should accomplish that end.
[Id. at 483, 484, 486, 388 A.2d 603 (citations omitted).]
In his concurring opinion Justice Pashman stated:
... as between the liability insurer and an innocent third party it is better policy to place the risk of loss with the insurer where the intent to injury [his tenants] ... is unclear....
....

*360 While the issue need not be reached here, it is my opinion that the so-called public policy against covering an insured for his intentional torts should be reexamined. This is particularly so where, as here, a subrogation theory exists so that the tortfeasor can in no way profit from his intentional wrongful act. With the prospect of criminal sanction and the spectre of civil liability despite coverage facing any wrongdoer, there is little reason to deny coverage which would protect the innocent injured party.
[Id. at 489, 492, 388 A.2d 603.]
A different result  finding exclusion of coverage  has properly been found in cases in which the criminal conduct has no relation at all to the professional service rendered. New Mexico Physicians Mutual Liability Co. v. La Mure, 116 N.M. 92, 860 P.2d 734 (1993). See cases cited in St. Paul Fire and Marine Ins. Co. v. Shernow, supra, 610 A.2d at 1284; Snyder v. Major, supra 789 F. Supp. at 649-650  e.g., no coverage where physician sexually abused three boys during treatment for various medical conditions; where dentist drugged a patient and performed sex on him; or where, while treating a wrist injury, physician drugged the patient and performed sex on him.
Courts have allowed coverage where psychiatrists or other mental health professionals are involved in sexual acts with patients, predicated on judicial acceptance of the failure of the professional properly to handle the transference and counter-transference phenomenon  alleged to be a medically recognized condition. These courts consider such transference as an integral part of therapy and thus sexual contact between therapist and patient are seen as foreseeably arising from such professional services. We are inclined to agree with Judge Kimba Wood's comments in Snyder, supra, that there is no meaningful distinction between "mishandling the transference phenomenon and mishandling a person's genitals." 789 F. Supp. at 649-650.[3] Moreover, *361 we believe that allowance of coverage for injuries suffered by a victim of a gynecologist's excessive examination of sexual organs is on a firmer legal footing than the mental health professional coverage based on the psychiatric theory of transference, even though expert evidence supported that theory.
In view of the foregoing, we conclude that Judge McVeigh properly found the carrier liable for the malpractice of its insured, Dr. Chunmuang, that resulted in injury to Ms. Davis. It was an injury resulting from a "medical incident" arising out of [his] supplying of professional services. We also hold, in light of Ambassador, supra, that Princeton may seek indemnity for such damages against Dr. Chunmuang.
Affirmed.
KEEFE, J.A.D., dissenting.
The majority concludes that Princeton must indemnify its insured, Dr. Chunmuang, for the emotional distress damages sustained by the insured's patient, June Davis, resulting from the insured's criminal sexual assault during the course of a gynecological examination, despite a clear exclusion in the policy for injuries resulting from such conduct. Princeton's recourse, according to the majority, is to seek indemnification from its insured. In coming to that conclusion, the majority essentially relies upon Ambassador Insurance Company v. Montes, 76 N.J. 477, 388 A.2d 603 (1978), a case I believe to be clearly inapposite to these facts. Therefore, I dissent.
The majority concedes that the Princeton policy provides "coverage for `injury' resulting from `professional services' unless the `injury' results from a `criminal act.'" (Op. at 354, 678 A.2d at *362 1146). The majority also acknowledges Davis's concession that the insured's conduct was criminal. Ibid. It is clear that the parties and this court are bound by that concession and Princeton's stipulation that Dr. Chunmuang's conduct was criminal. Ambassador Insurance, supra, 76 N.J. at 480, 388 A.2d 603. Yet, notwithstanding its binding effect on us, the majority concludes, without being asked to do so, that Princeton has failed to carry its burden of "demonstrating that the loss falls outside the scope of coverage." (Op. at 356, 678 A.2d at 1147). No explanation for that conclusion is given.
Inasmuch as both the indemnity clause and the exclusion clause of the subject policy focuses on the cause of the injury, the nature of the injury claimed is an important factor in determining coverage. Simply stated, if the claimed "injury" results from a "criminal act" it is not covered by the policy. The majority fails to acknowledge the uncontroverted fact that the injury for which Davis sought compensatory and punitive damages resulted solely from the insured's criminal act. Stated somewhat differently, but for Dr. Chunmuang's criminal act, Davis would have suffered no compensable injury. Therefore, on this record, Davis's injuries are clearly excluded by the plain language of the policy.
Davis's argument that the "`services performed and the assault are intertwined and inseparable'" (Op. at 355, 678 A.2d at 1146), is relevant only in the context of deciding whether Dr. Chunmuang's conduct constituted "professional services" within the meaning of the policy. As the majority opinion points out, there is some disagreement in the case law on that issue. St. Paul Fire & Marine Insurance Company v. Asbury, 149 Ariz. 565, 720 P.2d 540, 542 (App. 1986), resolved that issue in favor of the patient in a case where the assault took place during a gynecological examination. The court came to that conclusion "because the tortious sexual abuse of the patient was ... intertwined with and inseparable from the services provided." Regardless of whether Asbury expresses the majority or minority view, I am willing to accept its holding for the purpose of this case. That is to say, the totality of Dr. Chunmuang's conduct must be viewed as having taken place in *363 the course of rendering "professional services" so as to implicate the indemnity clause of the policy. However, as the majority concedes, "there will be coverage for `injury' resulting from `professional services' unless the `injury' results from a `criminal act.'" (Op. at 354, 678 A.2d at 1146). Therefore, this case is distinguishable from Asbury because Princeton's policy excludes injury resulting from a criminal act.
Reported cases that have addressed this subject where the insurance policy contains such an exclusion have uniformly held that, although the doctor's conduct may constitute a professional service, where it is also criminal, the exclusion prevents indemnity. New Mexico Physicians Mut. Liability v. LaMure, 116 N.M. 92, 860 P.2d 734 (1993); Medical Mut. Liab. Ins. Soc'y v. Azzato, 94 Md. App. 632, 618 A.2d 274, cert. denied, 330 Md. 319, 624 A.2d 491 (1993); Rivera v. Nevada Medical Liab. Ins. Co., 107 Nev. 450, 814 P.2d 71 (1991); Govar v. Chicago Ins. Co., 879 F.2d 1581 (8th Cir.1989). Despite the majority's effort to distinguish such cases on the ground that the insured's criminal conduct in each of them was not related to the professional services to be rendered by the insured, I find nothing in those opinions to suggest that the exclusion was enforced on that basis. Rather, the difference in the result turned on the presence of an exclusion against indemnity for criminal acts while Dr. Asbury had no such exclusion in his policy.
The majority concedes that Asbury is distinguishable from this case because of the exclusion but reasons that
New Jersey insurance law likewise is committed to the principle of protecting injured innocent victims by finding coverage in their favor, notwithstanding the fact that to insure the type of conduct of the insured may be against public policy or expressly excluded by the insurance policy itself  e.g., a criminal or intentional act. See Ambassador Insurance Company v. Montes, 76 N.J. 477, 388 A.2d 603 (1978); Burd v. Sussex Mutual Insurance Company, 56 N.J. 383, 267 A.2d 7 (1970). This is particularly so, where, as here, the conduct is otherwise within the coverage of the policy and is intertwined with and inseparable from the prohibited conduct. [Opinion at 356, 678 A.2d at 1147.]
I respectfully suggest to my colleagues that neither Ambassador nor Burd stand for the proposition that coverage will be afforded *364 in the face of an exclusion barring indemnity for criminal acts such as occurred in this case. Indeed, the Supreme Court has held that the Ambassador holding does not apply where, as in this case, the policy contains a specific exclusion for the insured's criminal conduct. Allstate Ins. Co. v. Malec, 104 N.J. 1, 12, 514 A.2d 832 (1986). It is clear that the holding in Ambassador which directed the insurer to indemnify against the insured's intentional behavior while subrogating the insurer to the victims' rights against the insured, turned on the absence of an exclusion against intentional conduct. The Court in Malec, supra, observed:

Ambassador was decided by a divided Court. The appeal produced three opinions. Neither time nor the opportunity for further deliberation has altered the conscientiously held views of the remaining members who participated in Ambassador. The Court is therefore not of one mind on the broad policy question whether, in the absence of a specific exclusion, a liability insurer can nevertheless be called on to indemnify a wrongdoer for his intentional misconduct that results in liability to an innocent third party.
[Id. at 12, 514 A.2d 832 (emphasis added).]
Burd, supra, is also inapposite to these facts. It simply stands for the proposition that both the insured and the injured claimant have the right to a plenary trial on the question of whether the insured's conduct fits within the exclusionary language of the policy where the question is whether the insured's otherwise intentional act was performed with the intention to injure. 56 N.J. at 397-398, 267 A.2d 7. That simply is not the issue in this case. Davis concedes that the insured's conduct constituted a criminal act, and does not argue that her injuries flowed from any source other than the sexual assault.
Further, it is clear from this record that Davis had no difficulty separating Dr. Chunmuang's professional conduct from his criminal conduct in the course of the gynecological examination. It is because she appreciated the difference between the two that she reported the event to the county prosecutor. It is also clear from Davis's testimony that her emotional distress injury flowed directly from her perception that Dr. Chunmuang went far beyond the scope of his professional services during the examination. Thus, there is no justification for ignoring the clear exclusion in the *365 Princeton policy because of some imagined inability to separate the professional service from the criminal conduct. If a seventeen year old patient had no difficulty doing so, this court should have no difficulty. The patient's expectations regarding coverage can rise no higher than Dr. Chunmuang's. Neither could possibly be confused by the policy language as applied to the facts of this case.
Inasmuch as an exclusion denying coverage for injuries stemming from criminal acts does not violate public policy, where the facts of the case clearly fit within the exclusion, the insurer should not be required to indemnify its insured against such acts. Allstate Ins. Co. v. Schmitt, 238 N.J. Super. 619, 570 A.2d 488 (App.Div.), certif. denied, 122 N.J. 395, 585 A.2d 394 (1990).
I would reverse the judgment under review and direct the entry of judgment for Princeton.
NOTES
[1] Other John Doe defendants were named in the complaint. They have not been identified, and plaintiff has not pursued that claim. The parties concede that the judgment under review is a final judgment on all claims and as to all parties.
[2] We note the discrepancy in the date of the visit between the complaint and Davis' testimony at the proof hearing.
[3] Judge Wood stated that the majority view is that sexual conduct is not a medical incident unless the physician is a psychiatrist and the sexual incident arises out of a therapeutic relationship. Snyder, supra, 789 F. Supp. at 650.

A recent opinion by another part of this court recognized the tort of clergy malpractice where the clergyman was engaged in counselling a parishioner and sexual relations occurred. The court cited cases holding social worker-counsellors and psychologists liable on the thesis of mishandling the transference phenomenon and questioning whether that thesis would apply to clergymen. F.G. v. Rev. Alex MacDonell, 291 N.J. Super. 262, 677 A.2d 258 (App.Div. 1996), approved for publication June 14, 1996.