STATE of South Dakota, Plaintiff and Appellee,

v.

Gary George ENGELMANN, Defendant and Appellant.

No. 19020.

Supreme Court of South Dakota.

Argued Oct. 16, 1995.

Decided Dec. 27, 1995.

Mark W. Barnett, Atty. Gen., Ronald D. Campbell, Asst. Atty. Gen., Pierre, for plaintiff and appellee.

Sidney B. Strange of Strange, Farrell, Johnson & Casey, P.C., Sioux Falls, for defendant and appellant.

KONENKAMP, Justice.

Defendant moved before sentencing to withdraw his guilty plea to second degree rape. Finding the circuit court's denial of the motion an abuse of discretion, we reverse and remand.

## Facts

Gary George Engelmann, a physician at Hand County Clinic in Miller, South Dakota, frequently performed gynecological examinations. On July 1, 1994, during a pelvic exam, a patient ran out of Engelmann's examining room to seek help from other members of the clinic staff. She accused him of raping her. In the resulting investigation, the State learned of several more female patients with similar charges against Engelmann. Prosecutors informed Engelmann's attorney of these additional accusations and that any plea bargaining should occur before the grand jury convened on August 24, 1994. Defense counsel traveled to Pierre on August 18, 1994 to review the transcribed interviews. By agreement he made no photocopies of these statements, but the attorney took notes so he could convey the details to Engelmann. The State fully informed defense counsel of all witnesses it intended to call.

Prosecutors offered Engelmann a plea agreement: in exchange for a guilty plea to one count of rape in the second degree no other charges would be made against him, but the State reserved its right to make whatever sentencing recommendation it thought appropriate. Defense counsel asked to delay convening the grand jury to allow more time to discuss the matter with Engelmann. Grand jury proceedings were postponed until August 31. On August 25 defense counsel informed prosecutors Engelmann would not plead guilty, but would

agree to plead nolo contendere. The State refused. Then another alleged victim came forward and prosecutors duly notified Engelmann's attorney. A day before the grand jury was scheduled to convene, defense counsel advised the State Engelmann would enter an *Alford* plea, i.e., he would plead guilty but maintain his innocence. See *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).[1]

At his initial court appearance and arraignment on September 7, 1994, Engelmann and his lawyer reviewed and signed the plea agreement prepared by the State. The circuit court thoroughly informed Engelmann of his constitutional and statutory rights as required by SDCL 23A–7–4 (Rule 11(c)). Engelmann's attorney assured the court his client understood both the nature of the charges and his constitutional and statutory rights. He added:

> I note, Your Honor, that we have discussed this at great length. It is a very difficult decision for Mr. Engelmann. He clearly did consider his option of trial. And that he does believe under the totality of the circumstances and for reasons that will be further elaborated upon in sentencing that this is, in fact, in his best interests. And I think Mr. Engelmann has been made aware that I have not attempted to influence him to make one choice or another, but attempted to present to him the options available and that he chose this option.

Engelmann pleaded guilty to second degree rape. SDCL 22–22–1(2). The court found Engelmann competent to enter the plea, that he did so "of his own free will," "without duress," with full knowledge of his rights and the maximum penalties involved. SDCL 23A–7–5 (Rule 11(d)). Finding the guilty plea adequately supported by a factual basis, the court accepted it:

> Well, this court has had an opportunity previously in chambers to review Exhibits 1 through 5 [Victim's statement and cor-

---

1. The United States Supreme Court approved a Defendant's option to waive a jury trial by pleading guilty while maintaining innocence to obtain the benefit of a favorable plea bargain. Over-

whelming evidence against a defendant may force a decision that it may be best to plead guilty, even if innocence is maintained, to avoid a more harsh result without the bargain.

roborating reports]. It is a finding of the court that Mr. Engelmann is represented by competent counsel. He's had ample opportunity to go over his alternatives and consider those. I take judicial notice of the fact he is an educated man with a Doctor's degree; that he does not desire a trial; feeling he has nothing to gain by going to trial. And I note that by entering into this bargain he reduces his maximum exposure from 150 years to 25 years; a fine of $150,000 to $25,000.

Engelmann was never called upon to express in his own words his reasons for choosing to plead guilty; other than "guilty" the only words he spoke were either "yes, sir" or "no, sir" in response to the court's various questions.

Three weeks later, before the sentencing date, Engelmann filed a motion to withdraw his plea. At the hearing on October 11, he complained about a "misapprehension" of the facts and procedures. When the trial judge questioned him, Engelmann admitted he understood the arraignment, the plea agreement, the rape charge and his rights as explained to him during his arraignment. After his plea, Engelmann had read for himself the reports provided to the court to substantiate a factual basis. Those reports were handed to his attorney just before the plea, but Engelmann said he had no time to read them. Under the plea agreement, the court could also consider the other alleged victims' statements as aggravating evidence in its sentencing decision. The reports on the other victims were not given to Engelmann's attorney until after the plea. Consequently, Engelmann declared:

I thought at the time that if I was able to explain those things to you, that my hope would be that I would not have to go to prison. It would be a way for my family, my wife and kids and the rest of my family—when I saw what these statements said on there, I thought there was no way that that was going to happen unless I was able to mount a more vigorous defense and cross-examine these witnesses and put on a trial.

I didn't think—if you seen these statements and what they had said and me not being able to do that, I didn't think you would have any choice but to send me to prison. And I will not go to prison for something I didn't do. At that time I didn't have any, very little information to make this decision on. When I got this further information, I decided that there was no way I could sit still and let those people say these things about me without defending myself. I was wrong to make that decision.

Engelmann insisted it was only after entering his plea he learned from his lawyer he could not "go over these charges one by one and pick them apart" at sentencing and offer evidence disputing all the victims' versions. Engelmann's attorney confirmed, however, he had discussed with him what the sentencing proceeding would entail. The trial court found Engelmann's claim of misunderstanding inadequate and denied his request to withdraw his plea. At the conclusion of the hearing, fearing he may be suicidal, the court placed Engelmann in custody. His mental condition was soon to become a critical issue. Unknown to his attorney, Engelmann had been treated by two mental health therapists before he pleaded guilty.

In an expanded motion hearing held on November 7, 1994, Engelmann, accompanied by new counsel, offered evidence on his mental status when he entered his plea. Engelmann testified he could "understand the words that were being said, but did [not] really understand the plea and all it entailed . . . ." To confirm this assertion, a psychologist, Duane Majeres, testified and a psychiatrist, Dr. Ulises Pesce, submitted a letter. Majeres and Pesce treated Engelmann two weeks before he pleaded guilty. They both diagnosed a "Major Depressive Episode, Severe without Psychotic Features." While Majeres conceded this diagnosis was not equivalent to legal insanity, he defined Engelmann's episode as a serious mental illness; people suffering from it simply cannot make rational decisions. In his letter, Dr. Pesce elaborated, "a patient suffering from a major depressive episode experiences many symptoms. Among them, the inability to think and concentrate is prevalent." Engelmann manifested several of the

diagnostic criteria for this disorder, according to these experts, including significant weight loss, chronic fatigue, diminished ability to think or indecisiveness, markedly diminished interest in all activities, and excessive sleep.

Neither Majeres or Pesce made their reservations about his decision-making impairment known to Engelmann, his family, or his attorney before the arraignment, though they knew he was vacillating over what plea to enter. On September 7, 1994 when he entered his plea, Engelmann was taking two medications: 100 milligrams of Zoloft, an anti-depressant drug, and Xanax, a minor tranquilizer. Engelmann began taking these medications in August. Majeres testified the anti-depressant medicine would not be effective until three to six weeks after taking it. Dr. Pesce added, one of Engelmann's medications "can cloud your thinking and slow your thought process."

The State countered with Dr. William Grant, a forensic psychiatrist. Dr. Grant confirmed Zoloft takes three weeks to a month to help a patient improve. He had not interviewed Engelmann, but from reviewing the medical information, he concluded Engelmann was competent to enter his plea, but agreed he would not have perceived the situation "with the mental clarity that a non-depressed person would." Engelmann's "thought processes would have been blunted by the condition, not removed, not destroyed, but blunted." Dr. Grant explained, "usually depression is pretty obvious." "If [a person] talked a lot, it would have come out." Yet Dr. Grant acknowledged, with Engelmann's limited "yes" or "no" answers to the court on September 7, "it isn't going to come out that way. But given an opportunity to talk some, I think it would have emerged."

Despite these facts, the trial court found Engelmann's request was based on whim or caprice and again refused to allow him to withdraw his plea. Engelmann was sentenced on December 30, 1994, to twenty years in prison. He appeals on the following issue:

> Did the trial court abuse its discretion by refusing to allow Engelmann to withdraw his guilty plea before sentencing?

### Analysis

■ "The term 'abuse of discretion' refers to a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence." *State v. Flying Horse*, 455 N.W.2d 605, 607–08 (S.D.1990); *Herndon v. Herndon*, 305 N.W.2d 917, 918 (S.D.1981). "The withdrawal of a guilty plea before the imposition of sentence is within the sound discretion of the trial court." [2] *State v. Grosh*, 387 N.W.2d 503, 505 (S.D. 1986). No defendant has an "absolute right to withdraw a guilty plea but the trial court's 'discretion in the matter should be exercised liberally in favor of withdrawal, unless it appears that the State has detrimentally relied upon the plea and the prosecution of the defendant has been thereby prejudiced.'" *Id.* at 505–06 (citations omitted). "When deciding whether to allow a criminal defendant to withdraw [a guilty] plea, the trial court must look at the reasons why the plea is sought to be withdrawn and if the request to withdraw is obviously frivolous, the trial court need not grant it." *Id.* at 506 (citations omitted).

■ Here, the circuit court found no prejudice and the State has not disputed this finding.[3] Thus our review is limited to whether Engelmann's request to withdraw his plea was frivolous. Engelmann need only state a tenable reason why withdrawal should be permitted, a reason based on more than a mere wish to have a trial. *Id.* A guilty plea withdrawal cannot be founded on mere "whim or caprice." *State v. Wahle*, 521 N.W.2d 134, 137 (S.D.1994).

---

2. SDCL 23A–27–11 states: "A motion to withdraw a plea of guilty or nolo contendere may be made only before sentence is imposed or imposition of sentence is suspended; but to correct manifest injustice a court after sentence may set aside a judgment of conviction and permit the defendant to withdraw his plea."

3. At oral argument the State mentioned the potential trauma to the victims should the guilty plea be withdrawn, certainly a weighty concern. Yet this was not raised as an issue in the appellate briefs.

Engelmann advances four reasons to support withdrawal of his guilty plea: (1) His *Alford* plea, which allowed him to maintain his innocence, should be freely revocable; (2) he misapprehended the specifics of the evidence against him and what he thought he could offer to dispute it at sentencing; (3) he was under financial and family pressure which affected his ability to make a decision in his best interests; and (4) his mental state impaired his ability to make rational decisions when he entered his plea. We review each assertion separately.

## 1. Alford Plea

■ As he has always maintained his innocence, even when he pled guilty, Engelmann reasons his claim of innocence preserves his right to a jury trial if he chooses to invoke it before sentencing. Engelmann urges us, therefore, to allow him to withdraw his *Alford* plea as a matter of right. We reject this view and approve the rationale of *United States v. Kobrosky*, 711 F.2d 449 (1st Cir. 1983): as with any guilty plea, an *Alford* plea cannot be withdrawn as a matter of course. "To bestow such a unilateral advantage upon the accused would defeat a legitimate goal of our criminal justice system, which strives to hold the balance between the prosecution and the prosecuted steady and true." *Id.* at 454. See also, *U.S. v. Buckley*, 847 F.2d 991 (1st Cir.1988)(cannot withdraw *Alford* pleas willy-nilly), cert. denied, 488 U.S. 1015, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989).

■ An *Alford* plea is no less a guilty plea, notwithstanding assertions of innocence. It allows a defendant the opportunity to avoid the risk of trial and obtain the benefit of a favorable plea bargain "even if he is unwilling or unable to admit his participation in the acts constituting the crime." *Alford*, 400 U.S. at 37, 91 S.Ct. at 167. Engelmann reaped the benefits of his plea agreement:

he reduced his potential punishment from 150 years to 25 years, the fine from $150,000 to $25,000, and he obtained immunity for criminal acts against known victims and any unknown victims discovered before the sentencing date. Hence, we discard as meritless Engelmann's circuitous argument that because he continues to claim innocence, he should be allowed to automatically withdraw his plea on that basis. Such a rule would allow defendants to enter a favorable plea bargain and then await the results of a presentence report before deciding whether to continue the plea. Effective management of our criminal justice process bars such maneuvering.

## 2. Misapprehension of Facts and Procedure

■ "Where the record shows that 'circumstances as they existed at the time of the guilty plea, *judged by objective standards*, reasonably justified [a defendant's] mistaken impression,' a defendant must be held to have entered [the] plea without full knowledge of the consequences and involuntarily." *Wahle*, 521 N.W.2d at 137 (quoting *United States v. Crusco*, 536 F.2d 21, 24–25 (3rd Cir.1976)(emphasis original). Engelmann contends he misapprehended the specifics of the charges against him and he was mistaken in his belief about the evidence he would be allowed to present at the sentencing hearing. A misapprehension of the facts may be a reason for permitting a withdrawal of a guilty plea. *State v. Walters*, 48 S.D. 322, 325, 204 N.W. 171, 172 (1925). In *Walters*, the defendant claimed he was induced to plead guilty by a promised sentencing recommendation. *Id.* Here no actions by the court or prosecutors led Engelmann into his alleged misapprehension. Engelmann discussed the plea with his attorney and assured the court he fully understood.[4]

---

4. In the September 7, 1994 arraignment, the following exchange took place:

> COURT: Mr. Butler, have you been over the nature of the charges with your client and his constitutional and statutory rights and the various penalties involved?
> COUNSEL: Yes, I have, Your Honor.
> COURT: And this is the full extent of the plea agreement?

> COUNSEL: Yes, it is, Your Honor.
> COURT: Mr. Engelmann, are you here today to enter a plea of your own free will and accord?
> DEFENDANT: Yes, sir.
> COURT: Other than this plea agreement, have any threats or promises been made to get you to enter a plea, one way or another?

■ Engelmann states he did not know all the details his accusers told about him when he pled guilty on September 7, 1994. The reports given to the court to establish a factual basis had been given to his attorney before the arraignment, but Engelmann claimed he had no time to read them. The State is not required to disclose any witness statements or reports to the defendant before their submission to the Grand Jury. *See* 23A–13–6. Engelmann admitted his attorney had orally discussed the contents of these investigative reports with him before entering his plea, but he was not told all the specifics contained in the reports. We agree with the analysis outlined in *Kobrosky*, where a similar contention was made:

> [Defendant] argued that compurgatorial evidence had come to light, some of which, he contended, had previously been kept under wraps by the government. He now claims that this evidence would have made the government's case seem less over-

> DEFENDANT: No, sir.
> COURT: You understand that any sentence recommended either by your attorney or the prosecuting attorney is not binding on this Court; I haven't agreed to any particular sentence?
> DEFENDANT: Yes sir.

5. The following exchange between the court and Engelmann took place at the October 11, 1994 hearing:

> COURT: What did he misunderstand is what I'm getting to. I want to know what misunderstanding or misapprehension or misrepresentation, whatever it was.
> DEFENDANT: That a good share of these women were not claiming sexual penetration during the pelvic exam. And when I got the statements and saw what they had said, my initial reaction was when I was making this plea is I was stating that I was not guilty of them.
> I was entering this plea for the benefits it gave me, not having to go to trial; not having to put my family through the trial; not having to put everybody else involved with it through the trial.
> I thought at the time that if I was able to explain those things to you, that my hope would be that I would not have to go to prison. It would be a way for my family, my wife and kids and the rest of my family—when I saw what these statements said on there, I thought there was no way that that was going to happen unless I was able to mount a more vigor-

whelming and would have convinced him to take his chances with a jury. Based on our review of the record, we agree with the district court that this evidence was neither fresh nor particularly exculpatory nor previously withheld by the government.

*Kobrosky*, 711 F.2d. at 456. The circuit court found Engelmann could not articulate any "misapprehended" material facts which would justify a withdrawal of the plea.[5]

Engelmann thought he could offer proof of his innocence at the sentencing hearing and when it became clear to him the trial court would not permit that kind of evidence during sentencing, he felt he had no choice but to withdraw his guilty plea and demand a trial. Engelmann's subjective assumptions cannot be attributed to the State, the court, or even his attorney. In actuality, he began to fear his sentence would be more severe than he expected when he pled guilty, certainly a deficient excuse for withdrawal.[6]

> ous defense and cross-examine these witnesses and put on a trial.
> I didn't think—if you seen these statements and what they had said and me not being able to do that, I didn't think you would have any choice but to send me to prison. And I will not go to prison for something I didn't do. At the time I didn't have any, very little information to make this decision on. When I got this further information, I decided that there was no way I could sit still and let those people say these things about me without defending myself. I was wrong to make that decision.

6. The court made the following findings of fact on Engelmann's claims:

> (1) That neither the prosecution, the Defendant's counsel nor the Court [led] the Defendant to believe his alleged misapprehension about the legal ramifications of the sentencing hearing.
> (2) That the Defendant was not able to articulate why he had these misapprehensions as to the legal ramifications of the sentencing hearing.
> (3) That at the time of the plea the Defendant acknowledged that he knew he was waiving a jury trial and the opportunity to examine and cross examine his accusers since he had nothing to gain from a trial.
> (4) That in reality the Defendant did not "misapprehend" anything, but rather two things happened:
>    a. That the Defendant now having seen the allegations in print, believed the Court may not

### 3. Financial and Family Pressures

■ Engelmann claims he was under pressure from family and friends to resolve this matter short of trial. Moreover, financial pressures loomed over his family because his wife, a physician at the same clinic, could not work until he resolved his legal problems. The circuit court rejected these considerations, concluding he was under no greater pressure than other persons charged with committing a serious felony. By itself, we see no error in this finding.

### 4. Defendant's Mental Status at Arraignment

■ In holding Engelmann's mental state insufficient to withdraw his plea, the court cited *State v. Lashwood*, 384 N.W.2d 319 (S.D.1986), a post-conviction appeal, not a pre-sentence plea withdrawal case. Under *Lashwood*, to render a plea involuntary the mental condition must be so debilitating the defendant is "unable to consult with counsel or to understand the proceedings." *Id.* at 321. A less stringent standard applies to pre-sentence requests: the court's discretion should be liberally exercised in favor of withdrawal, especially when no prejudice to the State is shown. *Wahle*, 521 N.W.2d at 137.

■ A diagnosis of "Severe Depressive Episode," a recognized mental disorder, reduced Engelmann's decision-making ability. Even the State's psychiatrist, though he disagreed with the depth of Engelmann's impairment, was unable to dispute this diagnosis, but confirmed Engelmann's blunted thought processes and diminished mental clarity. We find no difficulty in agreeing with the circuit court that, standing alone, the other reasons Engelmann gave to withdraw his plea were inadequate. Yet considering the totality of circumstances, his serious mental disorder was not a frivolous excuse. As the State left undisputed the finding it will not be preju-

diced by withdrawal of the guilty plea, Engelmann should have been allowed to withdraw it. The court's conclusion to the contrary was an abuse of discretion.

Reversed and remanded.

MILLER, C.J., and SABERS and GILBERTSON, JJ., concur.

AMUNDSON, J., concurs specially.

AMUNDSON, Justice (concurring specially).

In *State v. Grosh*, 387 N.W.2d 503, 505–06 (S.D.1986), this court held:

> The withdrawal of a guilty plea before the imposition of sentence is within the sound discretion of the trial court. SDCL 23A–27–11. There is no absolute right to withdraw a guilty plea, but the trial court's 'discretion in the matter *should be exercised liberally* in favor of withdrawal, unless it appears that the State has detrimentally relied upon the plea and the prosecution of the defendant has been thereby prejudiced.' (Citations omitted.) (Emphasis added.)

In this case, there is no question that the motion to withdraw was submitted prior to sentencing, nor is there any dispute regarding prejudice.

Further, Engelman has always asserted his innocence as evidence by the type of plea entered, to-wit: the *Alford* plea, which was accepted by the trial court and the prosecution. I can accept the majority's position that an *Alford* plea does not equate to an automatic right to withdraw same. On the other hand, the entry of this type of plea should be an important factor when exercising discretion liberally. *United States v. Boone*, 869 F.2d 1089 (8th Cir.1989); *United States v. Barker*, 514 F.2d 208 (D.C.Cir.1975), *cert. denied* 421 U.S. 1013, 95 S.Ct. 2420, 44 L.Ed.2d 682 (1975).

believe an argument to look at his charges of something less than a rape situation and that he will, in fact, be treated just as any other person charged with rape.

b. That the Defendant's *Alford* plea, guilty but not guilty, had not been accepted by his

family, friends, and the public as he had hoped it would be in that the public knows a legal fiction when they see it, thus the Defendant now wants to change his mind as to the plea.

In this particular case, the type of plea and the mental condition of Engelmann when considered together certainly provide a basis for an exercise of liberal discretion for granting the withdrawal. What does Engelmann get as a benefit from this? The opportunity, at a minimum, to face a conviction on all counts which the State chooses to file with the potential for 150 years of confinement and $150,000 in fines.