2002 SD 8

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY, a Minnesota Corporation, Plaintiff and Appellant,**

v.

**Gary ENGELMANN, Defendant,**

**Natasha Baloun, Natalie Bertsch, Brian Bertsch, Nancy Froning, Greg Froning, Audra K. Martinmaas, Defendants and Appellees.**

**No. 21357.**

Supreme Court of South Dakota.

Argued Sept. 21, 2000.

Reassigned March 12, 2001.

Reassigned Oct. 9, 2001.

Decided Jan. 16, 2002.

Rehearing Denied Feb. 22, 2002.

Bethany K. Kulp, David M. Wilk of Oppenheimer, Wolff & Donnelly, St. Paul, MN, Cheryle Wiedmeier Gering of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for plaintiff and appellant.

Steven J. Andreasen, N. Richard Willia of Gildemeister, Willia & Keane, Sioux City, IA, for defendant and appellee Natasha Baloun.

A. Russell Janklow, Ronald A. Parsons, Jr. of Johnson, Heidepriem, Miner, Marlow & Janklow, Sioux Falls, Sheila S. Woodward of Johnson, Heidepriem, Miner, Marlow & Janklow, Yankton, for defendants and appellees Natalie Bertsch, Brian Bertsch, Nancy Froning, Greg Froning, and Audra K. Martinmaas.

KONENKAMP, Justice (on reassignment).

[¶ 1.] In this declaratory judgment action brought to contest medical malpractice insurance coverage, the circuit court granted summary judgment against the insurer, reasoning that the general verdict in the doctor's malpractice trial was conclusive on the coverage question. The jury in that trial heard two tort theories, one that would permit coverage and another that would not. Because the insurer reserved its right to contest coverage and a question of fact remains on what, if any, part of the damages are allocable to the covered acts of the doctor, coverage must be decided in a separate trial. We affirm in part, reverse in part, and remand for trial.

## A.

### Background

[¶ 2.] The events leading to this appeal began in Miller, South Dakota. Gary Engelmann practiced medicine there at the Hand County Clinic. In July 1994, he performed a pelvic examination on Natasha Baloun. During the exam, she became suspicious of his unusual motions and his closeness to her. When she abruptly sat up, she saw his penis. She fled the room and later contacted the police. After her experience became public, other women came forward. Plaintiffs Audra Martinmaas, Natalie Bertsch, and Nancy Froning lodged similar complaints against Engelmann. He was charged with multiple counts of raping his patients.

[¶ 3.] In an agreement with the prosecutor, Engelmann pleaded guilty to one count of second degree rape, but before sentencing, he sought to withdraw his plea. The circuit court refused his request. He appealed. In *State v. Engelmann*, 541 N.W.2d 96 (S.D.1995), we reversed, concluding that he had a nonfrivolous reason to withdraw his plea because at the time he entered it his thought processes were blunted by prescription medications and severe depression. He proceeded to trial. A jury acquitted him of all charges.

[¶ 4.] Plaintiffs Martinmaas, Bertsch, and Froning brought civil actions against Engelmann. After a consolidated trial, the jury awarded $450,000 damages to each plaintiff and $50,000 each to Bertsch's and Froning's husbands. We affirmed in *Martinmaas v. Engelmann*, 2000 SD 85, 612 N.W.2d 600. There, a majority of this Court held that Engelmann's improper

sexual contact constituted "malpractice" because it breached the physician's duty to use care and skill in the practice of medicine. *Id.* at ¶ 31. Natasha Baloun also sued. Her case is still awaiting trial.

[¶ 5.] St. Paul Fire & Marine Insurance Company insures Engelmann and the Hand County Clinic under two different policies: a commercial general liability policy and a professional liability policy. In this declaratory judgment action, St. Paul contends that it has no duty to indemnify Engelmann for the jury verdict in the consolidated trial and no duty to defend or indemnify him in the pending Baloun case. After both sides moved for summary judgment, the circuit court agreed that rape and sexual exploitation are not covered, but held nonetheless that the insurer had not "shown that the facts found by the jury as the basis of the award [were] the alleged rape and/or sexual abuse...." Concluding that the tort verdict was susceptible to two different constructions, and that one was sustainable for coverage purposes, the court ruled that St. Paul failed as a matter of law in its burden of proving noncoverage and was therefore obligated to indemnify Engelmann for the entire verdict. Lastly, the court held that St. Paul must defend the pending Baloun suit against Engelmann and the Clinic, but declined to decide before the verdict in that case whether St. Paul must indemnify Engelmann and the Clinic for any award Baloun may obtain.

[¶ 6.] St. Paul appeals on the following issues: (1) Are the damages awarded in the consolidated trial covered under the St. Paul policies? (2) Is St. Paul obligated to defend Engelmann against the Baloun action? (3) Is St. Paul obligated to defend the Clinic against the Baloun ac-

tion under the professional liability policy? (4) Does public policy preclude St. Paul from defending and indemnifying Engelmann against the Baloun action or indemnifying him against the consolidated action? We restructure these issues for better analysis, but we need not address the last question because we conclude that neither policy insures Engelmann's intentional misdeeds.

**B.**

**The Commercial General Policy**

[¶ 7.] The commercial general policy contains several provisions applicable here. It covers "bodily injury" caused by an "event," defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The policy specifically excludes coverage for "bodily injury or property damage ... expected or intended by any protected person." More particularly, the policy does not insure Clinic employees, including Engelmann, for "bodily injury or personal injury that results from sexual abuse committed by that person...." In the policy, "sexual abuse means any physical, mental or moral harassment or assault of a sexual nature against any person." Finally, the policy carries a "professional services" exclusion.[1] Under related circumstances, the Louisiana Supreme Court ruled that a comprehensive business liability insurance policy excluding personal injury arising out of professional services furnished no coverage for medical malpractice. *McCarthy v. Berman,* 668 So.2d 721, 725 (La.1996). Likewise, we conclude that St. Paul's commercial general liability policy provides no coverage for personal injuries from sexual

---

1. Listed among the exclusions is the following: "We won't cover injury or damage or medical expenses that result from the perfor- mance of or failure to perform health care professional services."

assaults or from rendering or failing to render professional services. Hence, medical malpractice, in any form, is not a covered occurrence. St. Paul is under no duty to defend or indemnify Engelmann and the Clinic under this policy.

## C.

### The Professional Policy

■ [¶ 8.] Engelmann's professional liability policy covers "damages resulting from" the "providing or withholding of professional services." A duty to indemnify arises only on a showing that the insured contingency occurred. *Headlee v. New York Life Ins. Co.*, 69 S.D. 499, 504, 12 N.W.2d 313, 315 (1943). The policy does not specifically define "professional services." For guidance on this term, we look to other jurisdictions. In *Marx v. Hartford Accident and Indemnity Company*, the Nebraska Supreme Court ruled that to find whether an act constitutes a professional service, courts look "not to the title or character of the party performing the act, but to the act itself." 183 Neb. 12, 157 N.W.2d 870, 872 (1968). Thus, coverage encompasses "professional" acts or services, those entailing the performance of a vocation, calling, or occupation requir-

ing learning and intellectual skill. The professional nature of an act qualifies it as "professional service." A physician who sexually assaults a patient on the pretense of rendering medical care performs no professional service. Many courts follow the *Marx* blueprint. Simply put, sexual assaults of medical patients by physicians are not covered functions contemplated within the rendering of professional services.[2]

[¶ 9.] In contrast, a minority view persists in a few courts. The lead decision in this area is *St. Paul Fire & Marine Ins. Co. v. Asbury*, 149 Ariz. 565, 720 P.2d 540 (Ariz.Ct.App.1986). There, the court ruled that all tortious acts professionals commit that are intertwined and inseparable from the services provided are covered occurrences. Unlike the *Marx* formulation, *Asbury* declares that malpractice insurance covers the physician, not the conduct of the physician. In *Asbury*, a gynecologist improperly manipulated his patients' clitorises during routine pelvic exams. The court found this misconduct inseparable from professional services.

■ [¶ 10.] Although we reject the *Asbury* rationale because St. Paul's policy

---

**2.** *Hirst v. St. Paul Fire & Marine Ins. Co.*, 106 Idaho 792, 683 P.2d 440, 444 (1984) (intentional sexual assault not within professional services for insurance coverage purposes); *St. Paul Fire & Marine Ins. v. Quintana*, 165 Mich.App. 719, 419 N.W.2d 60, 63 (1988) (damages arising out of performance of professional services do not include damages for sexual assault); *Niedzielski v. St. Paul Fire & Marine*, 134 N.H. 141, 589 A.2d 130, 133 (1991) (sexual assault does not fall within the meaning of professional dental services); *N.M. Physicians Mut. Liability v. LaMure*, 116 N.M. 92, 860 P.2d 734, 739 (1993) (sexual acts committed under pretense of medical care not professional services in the context of malpractice insurance coverage); *Cluett v. Med. Protective Co.*, 829 S.W.2d 822, 829 (Tex. App.- Dallas 1992), (writ denied) (a pediatri-

cian's sexual relationship with a patient was not a professional service); *Smith v. St. Paul Fire & Marine Ins. Co.*, 353 N.W.2d 130, 132 (Minn.1984) (sexual assault by medical doctor on three minor boys during the course of treatment not covered by professional liability insurance as doctor's acts were only "for the satisfaction of [his] prurient interests" and thus "involved neither the providing nor withholding of professional services"); *Washington Ins. Guar. Ass'n v. Hicks*, 49 Wash.App. 623, 744 P.2d 625, 627–28 (1987) (chiropractor's sexual conduct not part of medical treatment); *Standard Fire & Ins. Co. v. Blakeslee*, 54 Wash.App. 1, 771 P.2d 1172, 1176–78 (1989) (dentist's act of fondling drugged patient's breasts not covered by insurance policy as sexual assault was not part of professional services).

language speaks plainly of coverage for professional services, we believe that even *Asbury's* rule would not permit coverage here. Perhaps a doctor's hand inappropriately touching part of a patient's genitals may in some way be inseparable from the function of performing a pelvic examination. But a doctor's penis in no way belongs in, much less intertwines with, a gynecological exam. All but one of the plaintiffs testified that they were raped when Engelmann inserted his penis into them.[3] Under the professional liability policy, injury from sexual misconduct cannot be considered as having been incurred from the "providing or withholding of professional services." *See* David S. Florig, *Insurance Coverage for Sexual Abuse or Molestation,* 30 Tort & Ins. L.J. 699, 724 (1995). St. Paul is under no obligation to indemnify Engelmann for such acts. But our analysis does not end here.

[¶ 11.] If the question were only whether Engelmann's professional liability policy covers rapes and sexual assaults, then, as we have seen, the answer is clearly no. Rape and sexual exploitation in the course of a pelvic exam are intentional acts situated well outside the ambit of failure to use due care and skill in providing professional services. Here, however, there were two theories of recovery given to the jury in the medical malpractice trial: (1) "negligence" by "engaging in improper sexual contact with each plaintiff during her gynecological examination," and (2) "negligence" by performing "gynecological examinations [using] improper positions, procedures and methods in conducting those examinations." The first theory affords no legitimate basis for coverage, but what of the second theory?

[¶ 12.] A liability policy that provides protection for professional services contemplates coverage for "improper or incorrect medical treatment of a physical ailment by the insured doctor." *Smith v. St. Paul Fire & Marine Ins. Co.,* 353 N.W.2d 130, 132 (Minn.1984). The act in question must be a "medical or dental act, not an act or service that requires no professional skill." *Lindheimer v. St. Paul Fire & Marine Ins. Co.,* 643 So.2d 636, 638 (Fla.Dist.Ct.App.1994).

[¶ 13.] We think the second theory allows for coverage in that the medical experts for Martinmaas, Bertsch, and Froning testified that Engelmann's unorthodox methods, such as his "gauze procedure," fell below the standard of care for physicians. His acts under the second theory, although medically unsuitable, lie within the scope of professional services and thus are covered under his professional liability policy. Yet St. Paul contends that the plaintiffs' own renditions of fact belie the second theory, since the plaintiffs described Engelmann's acts as intentional sexual assaults. The question is not that simple. Much of the plaintiffs' observations were circumstantial because they could not see what Engelmann was doing. The jury may have doubted part of their testimony, but still accepted enough of it to undergird the experts' opinions that Engelmann's acts fell below the standard of care. We see this as a factual issue. Supporting this conclusion is the fact that the "knee-chest" position Froning had to assume for a pelvic exam, though not medically indicated in her circumstance, in-

---

**3.** Baloun testified that she saw Engelmann's penis during the exam when she sat up. Bertsch "felt like she was having sex." Martinmaas "felt as if she was having intercourse." Froning is the only plaintiff in the original action that did not claim Engelmann was having intercourse with her. Whether the jury believed they were raped remains unknown.

volved no offensive contact. *Martinmaas*, 2000 SD 85, ¶ 15, 612 N.W.2d at 605. Froning never claimed that she was sexually assaulted. *Martinmaas*, 2000 SD 85, ¶ 31 n. 6, 612 N.W.2d at 608 n. 6.

■ [¶ 14.] The second theory allows for coverage, but we do not know which theory in the malpractice action the jury adopted or whether it adopted both. Although the circuit court ruled that the tort judgment did not collaterally estop St. Paul to assert noncoverage, the court nonetheless used the jury's general verdict against the insurer as the basis for finding coverage. The court granted summary judgment against St. Paul, reckoning that the tort verdict was subject to two different constructions, and one was sustainable for coverage purposes. In our view, neither side was entitled to summary judgment on this issue. What part of the victims' damages can be allocated to the covered second negligence theory must be litigated as a question of fact in this declaratory action.

■ [¶ 15.] A court faces a conceptually impossible task in ruling on a summary judgment motion based on facts decided in another case in which multiple theories were presented and only a general verdict was rendered. Here, the verdict in the liability case is susceptible of at least two reasonable interpretations. Summary judgment can be granted only when "there is no genuine issue as to any material fact." SDCL 15–6–56(c). Not only must the facts be not in issue, but also there must be no genuine issue on the inferences to be drawn from those facts. *Wilson v. Great N. Ry. Co.*, 83 S.D. 207,

212, 157 N.W.2d 19, 21 (1968). That both sides move for summary judgment does not mean that there are no genuine issues, obliging a court to grant judgment for one side or the other. *American Fidelity & Casualty Co. v. London & Edinburgh Ins. Co.*, 354 F.2d 214 (4thCir.1965). Both motions must be denied if the court detects genuine issues of fact or genuine issues regarding the inferences to be drawn from the facts. *Hindes v. United States*, 326 F.2d 150, 152 (5thCir.1964), cert. denied, 377 U.S. 908, 84 S.Ct. 1168, 12 L.Ed.2d 178; 3 Barron and Holtzoff § 1239 (Wright ed. 1958).

### D.

### Insurer's Right to Litigate Coverage

■ [¶ 16.] Generally, an insurer who defends an insured waives the right to assert policy defenses unless it first notifies the insured that it disclaims liability under the policy. *See* 7 C.J. Appleman, Insurance Law & Practice § 4694 p. 336 (Bendal ed. 1979) [hereinafter Appleman].[4] Under South Dakota law, if an insurer has a duty to defend its insured, it is bound—absent a reservation of rights—under the doctrine of collateral estoppel by those facts decided in the action against the insured that are essential to the judgment of liability, whether the insurer elects or refuses to defend. *Ziegler v. Ryan*, 66 S.D. 491, 285 N.W. 875, 880 (S.D.1939).[5]

■ [¶ 17.] On the other hand, if the insurer's interest in defending the claim while restricting its obligation to the terms of the policy creates a conflict of interest between the insured and the in-

---

4. *See also* Annotation, *Liability Insurance: Insurer's Assumption of or Continuation in Defense of Action Brought Against the Assured as Waiver or Estoppel as Regards Defense of Noncoverage or Other Defense Existing at Time of Accident*, 38 A.L.R.2d 1148 (1954).

5. *See also Pendleton v. Pan American Fire & Casualty Co.*, 317 F.2d 96, 99 (10thCir.1963); *Hartford Acc. and Indem. Co. v. Villasenor*, 21 Ariz.App. 206, 517 P.2d 1099, 1102 (1974).

surer, there can be no estoppel from litigating in a later proceeding those issues on which there was a conflict of interest. As the California Supreme Court explained, "if the insurer adequately reserves its right to assert the noncoverage defense later, it will not be bound by the judgment" against the insured. *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 279, 419 P.2d 168, 178, 54 Cal.Rptr. 104, 114 (1966). By reserving the noncoverage issue, a conflict of interest will be avoided and the interests of the insured and the insurer in defending against the injured claimant will be identical.[6] Likewise, the Arizona Supreme Court, declaring it the better rule, held that "where there is a conflict of interest between an insured and [an] insurer, the parties will not be estopped [to] litigat[e] in a subsequent proceeding those issues as to which there was a conflict of interest. . . ." *Farmers Ins. Co. of Ariz. v. Vagnozzi*, 138 Ariz. 443, 675 P.2d 703, 708 (1983) (faced with a potential coverage defense, the insurer properly reserved its right to later assert the policy's intentional act exclusion); *see also* Restatement (Second) of Judgments § 58 (1982); *St. Paul Fire & Marine Ins. Co. v. Crosetti Bros., Inc.*, 256 Or. 576, 475 P.2d 69, 71 (1970).

 [¶ 18.] Insurers are obliged to keep separate the independent duty to defend from the obligation to indemnify their insureds.[7] A conflict of interest "exists when the injured person's claim against the [insured] is such that it could be sustained on different grounds, one of which is within the [insurer's] obligation to indemnify and another of which is not." Restatement, Judgments § 58. These principles and the problems they create are explained in the comment to the Restatement, Judgments § 58:

On the one hand, the [insurer] has a duty to defend the [insured] even if the claim advanced in the action by the injured party is outside the scope of the indemnity obligation. In carrying out this duty, the [insurer] must seek to protect the [insured] even though in doing so it must take positions on the [insured]'s behalf that are contrary to its own interest. For example, the [insured] may ·be charged alternatively with having acted negligently and intentionally. In such a situation, it is to the [insured]'s interest that the claim, if sustained at all, be sustained on the basis of negligence because the loss will then fall on the [insurer], but it is to the [insurer]'s interest that the claim of negligent wrongdoing be resisted because liability on that basis would fall with the obligation to indemnify.

On the other hand, the [insurer] has a right to its day in court on whether the [insured]'s liability is within the scope of the indemnity obligation. A corollary of this right is that the [insurer] should not be estopped by steps or positions that the [insurer] may have taken in the course of performing its duty to defend the [insured]. Hence, the usual rule that an [insurer] is precluded by the determination of issues which he litigates on behalf of an [insured], stated in § 57, should not apply to an [insurer] who defends, under the compulsion of an independent duty to defend, an [insured] with whom he has a conflict of interest.

---

**6.** *See also Snodgrass v. Baize,* 405 N.E.2d 48 (Ind.Ct.App.1980) (insured entitled to litigate coverage in supplemental proceeding).

**7.** Because attorneys representing insureds on behalf of carriers owe an undeviating fealty to the insureds, attorneys act unethically if they attempt to preserve the insurer's noncoverage claim while purporting to represent the best interests of the insureds. *State Farm Mut. Auto. Ins., Co. v. Armstrong Extinguisher Serv., Inc.,* 791 F.Supp. 799, 802 (D.S.D.1992).

The only way to reconcile these duties is to recognize that an [insurer] who has an independent duty to defend the [insured] in effect has two legal capacities with regard to the [insured]. In his capacity as insurer against the [insured]'s risk of being sued on claims that "might be found to be" within the indemnity obligation, the [insurer] has a responsibility to provide counsel and supporting assistance to defend the [insured] without regard to the [insurer]'s interests, essentially as a guardian for a ward. In his capacity as [insurer], he has a responsibility to indemnify for such liability as may be within the indemnity obligation. In the latter capacity, he should not be bound by determinations in an action in which he participated in the former capacity if there is conflict of interest between the two. See § 36. The [insurer] may be required to manifest this differentiation by a reservation of its right qua [insurer] when it assumes the defense of the [insured].

[¶ 19.] As Engelmann's insurer, St. Paul defended him under a reservation of rights. A reservation of rights is a notice to the insured that the insurer will defend the insured but that the insurer is not waiving any defenses it may have under the policy. By this method, insurers can provide the insured a defense to liability and reserve for later the question whether the policy provides coverage. As in most jurisdictions, acting under a "reservation of rights" is an established procedure in South Dakota. "An insurer is not estopped notwithstanding participation in defense of an action against insured to assert noncoverage if timely notice was given to the insured that it has not waived benefit of its defense under the policy."[8] *Connolly v. Standard Cas. Co.*, 76 S.D. 95, 73 N.W.2d 119, 122 (S.D.1955). *See also* Appleman § 4692 at 297.

[¶ 20.] St. Paul provided Engelmann with a splendid defense in his malpractice trial. Indeed, the jury's verdict is so structured as to create at least an arguable issue whether the judgment is within the scope of insurance coverage.[9] Counsel for Engelmann could have breached the obligation of fealty to the insured if he had advocated for special interrogatories or separate verdicts on the rape and sex abuse allegations. We must reflect now, though, that the insurer's right to challenge coverage for Engelmann's sexual misconduct was not decided in the tort trial and could not have been decided there. St. Paul cannot be foreclosed from proceeding with its challenge to coverage in this declaratory action.

[¶ 21.] Because the insurer is entitled to contest the noncoverage question, we remand this case for the parties to litigate the factual issue of what part of the

---

8. South Dakota's UCC also grants recognition to reservations of rights:

A party who, with explicit reservation of rights, performs or promises performance or assents to performance in a manner demanded or offered by the other party does not thereby prejudice the rights reserved. SDCL 57A–1–207.

9. In connection with alternative theories of recovery, some courts have stated that insurance defense counsel should not request that special interrogatories be propounded to the jury for the purpose of delineating which part of the verdict is covered under the policy. *Gray*, 65 Cal.2d at 279 n. 18, 54 Cal.Rptr. 104, 114 n. 18, 419 P.2d at 178 n. 18 ("special verdict might present a potential conflict of interest"); *Cowan v. Insurance Co. of N. Am.*, 22 Ill.App.3d 883, 897, 318 N.E.2d 315, 326 (1974). In these circumstances, counsel hired by the insurer owes an enhanced obligation of good faith to the insured. *Tank v. State Farm Fire & Casualty Co.*, 105 Wash.2d 381, 715 P.2d 1133, 1137 (1986).

victims' damages, if any, are allocable to the covered second negligence theory.[10] We affirm the circuit court's denial of the insurer's motion for summary judgment on the issue of providing a defense to Engelmann and the Clinic in Baloun's malpractice suit. Correspondingly, we agree with the circuit court that a ruling on summary judgment on the indemnity issue in Baloun's case is premature. As with the others, she may be able to establish a theory equivalent to the second theory offered in the earlier malpractice trial.

[¶ 22.] Affirmed in part, reversed in part, and remanded for trial.

[¶ 23.] AMUNDSON, Justice, concurs in part and concurs specially in part.

[¶ 24.] DOBBERPUHL, Circuit Judge, concurs specially.

[¶ 25.] GILBERTSON, Chief Justice and MILLER, Retired Chief Justice, dissent.

[¶ 26.] DOBBERPUHL, Circuit Judge, sitting for SABERS, Justice, disqualified.

AMUNDSON, Justice (concurring in part and concurring specially in part).

[¶ 27.] I join, at a minimum, the remand of this matter as provided for in Justice Konenkamp's writing. It seems that fundamental fairness requires, in this type of a case, that the insurers be given their day in court when they did not breach their duty to defend during the underlying action.

[¶ 28.] I also concur with the special writing of Judge Dobberpuhl, which I feel is consistent with my dissent in *Martinmaas v. Engelmann*, 2000 SD 85, ¶¶ 79–86, 612 N.W.2d 600, 617.

DOBBERPUHL, Circuit Judge, concurring, writing specially.

[¶ 29.] I respectfully agree with the lion's share of the majority's writing. For that reason I give my concurrence to the opinion. For purposes of attaining a majority decision on the crucial aspects of this case, I reluctantly give my concurrence to the decision to remand this case to the trial court. With that said, I write specially to make clear the few objections I have with the majority opinion.

### The acts by Engelmann were intentional

[¶ 30.] The acts by Engelmann were intentional. The plaintiffs at trial put on a masterful display to convince the judge and jury that somehow the acts they were accusing the defendant of could be considered medical malpractice. The jury was instructed that any negligent misconduct on the part of the defendant was medical malpractice, and that sexual contact could

---

10. The dissent mischaracterizes our ruling as a remand to decide on which theory of recovery the Martinmaas jury rendered its decision. That, of course, is absurd, as the dissent recognizes. Indeed, the dissenting Justice who authored the opinion in the malpractice appeal acknowledged there that "we do not pass judgment on whether Engelmann's actions would be indemnified under a medical malpractice insurance policy." *Martinmaas* at ¶ 33. Perhaps it needs repeating that the law distinguishes between an insurer's duties to defend and to pay. An insurer must defend claims potentially not covered, including those that are groundless, false, or fraudulent.

*See*. Appleman § 4684, at 80–87. St. Paul fulfilled its duty to defend. It now has the right to litigate the duty to pay. The fact finder in this declaratory action will decide whether the injuries the plaintiffs suffered were the result of uncovered intentional acts or covered "negligence" by performing "gynecological examinations [using] improper positions, procedures and methods in conducting those examinations." *See Vagnozzi*, 675 P.2d at 710 (trial court erred in granting summary judgment to insurer in declaratory action because whether acts that caused injury were intentional or reckless or negligent were jury questions).

somehow be "negligence." *See Martinmaas v. Engelmann,* 612 N.W.2d 600 (S.D. 2000). As the testimony of the expert doctors reveal, no medical book used in the civilized world recognizes the behavior of Engelmann as medical in nature. Of course it is malpractice, but it is also intentional malpractice that is sexual in nature. Terming these actions as medical is just as much a smokescreen now on the part of the plaintiffs, as it was on the part of the defendant when he committed these acts.

[¶ 31.] If it walks like a duck, and if it quacks like a duck, it sure isn't a goose; and that is what the plaintiffs are claiming. They argue that this intentional sexual misconduct (termed so by their own testimony) is somehow medical enough in nature to fall under the guise of medical malpractice and is covered by the doctor's professional insurance policy. That is plainly antithetical to South Dakota law and a long history of South Dakota jurisprudence.

[¶ 32.] South Dakota public policy does not allow insurance coverage for intentionally tortious acts. This sort of malpractice, inflicted by Engelmann, was intentional and inherently injurious. State law clearly maintains that it is against public policy in South Dakota for one to insure against an intentional act.[11] St. Paul has appropriately relied upon that well-known axiom. South Dakota has recognized this for many years. *See De Zotell v. Mutual Life Ins. Co. of New York,* 60 S.D. 532, 245 N.W. 58, 59 (1932) ("The principles which forbid such unconscionable enrichment of the criminal are implicit in the ancient common-law maxim 'Nullus commodum capere potest de injuria sua propria' (Co

Litt 148 b) anglicized as section 49 of our 1919 code providing that 'no one can take advantage of his own wrong.' These principles require no exposition, and are supported by an almost imperative public policy"); *Zeigler v. Ryan,* 63 S.D. 607, 262 N.W. 200 (1935) (an agreement to indemnify another against unlawful acts involving moral turpitude, is void if the unlawful act is known to such person at the time of its commission); *Raphtis v. St. Paul Fire & Marine Ins. Co.,* 86 S.D. 491, 198 N.W.2d 505, 507 (1972) ("It is contra bonos mores to allow a man to insure against the consequences of his own rascality or recover for a loss resulting from his own criminal conduct."); *City of Fort Pierre v. United Fire and Cas. Co.,* 463 N.W.2d 845, 849 (S.D.1990) ("Were a person able to insure himself against economic consequences of his intentional wrongdoing, the deterrence attributable to financial responsibility would be missing") (quoting *Ambassador Ins. Co. v. Montes,* 76 N.J. 477, 388 A.2d 603, 606 (N.J.1978)) (Henderson and Sabers, JJ., dissenting on other grounds); *Klatt v. Continental Ins. Co.,* 409 N.W.2d 366, 372 n. 6 (S.D.1987) ("One cannot insure himself against the consequences of his willful acts, committed with the intent to inflict injury."); *State Farm Mut. Auto. Ins. Co. v. Wertz,* 540 N.W.2d 636, 640 (S.D.1995) ("public policy prohibits extending insurance coverage to an individual who intentionally harms others"); 9 Couch on Insurance 2d, § 39:15 at 506–07 (1985 ed.) ("Any insurance which purports to protect the insured against any loss which he may purposely and willfully cause, or which may arise from his immoral, fraudulent, or felonious conduct, is void as against public policy.").

---

11. A legislative expression of this public policy is also found in SDCL 53-9-3, which provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud or willful injury to the person or property of another or from violation of law whether willful or negligent, are against the policy of the law."

[¶ 33.] This Court specified in *Wertz* that the "critical issue" is not whether the tortfeasor "intended to act, but whether he intended to inflict the resulting injuries." *Wertz* at 639. "An insured's act is not an accidental contributing cause of injury when the insured actually intended to cause the injury that results.... Nor can an insured's intentional act be an accidental cause of injury when it is so inherently injurious that it cannot be performed without causing the resulting injury." *Vermont Mut. Ins. Co. v. Malcolm*, 128 N.H. 521, 517 A.2d 800, 802–03 (1986). *See also Providence Mut. Fire Ins. Co. v. Scanlon*, 138 N.H. 301, 638 A.2d 1246, 1249 (1994), (holding that "an act is inherently injurious if it is certain to result in **some** injury, although not necessarily the alleged injury." (emphasis in original)).

[¶ 34.] This Court held in *American Family Mutual Ins. Co. v. Purdy*, 483 N.W.2d 197 (S.D.1992), that as a matter of law, there is an inference that harm to the victim is expected or intended by the perpetrator of criminal sexual acts. "We hold these acts of criminal sexual contact are of such a nature that the intent to inflict bodily injury will be inferred as a matter of law. The exclusion for bodily injury either 'expected or intended' in this policy applies to these facts." *Id.* at 201.

[¶ 35.] Similarly, in this present case, and in general, inappropriate sexual contact with a patient, combined with the utilization of improper examination positions, procedures and methods, which are solely for the prurient interests of the physician, are sure to result in injury to the patient.

[¶ 36.] Engelmann knew he was engaging in acts that were, at the very least, unprofessional conduct. He knew or should have known that conduct, such as he perpetrated, could result in everything from loss of licensure to criminal prosecu-tion. These acts, although defined as malpractice, are not negligent professional conduct; these acts are intentional unprofessional conduct, of which it is against public policy to insure.

[¶ 37.] By the insurance contract definition, the conduct of Engelmann was intentional. It is against public policy to insure against intentional actions to cause harm. The purpose of the professional liability policy was to protect against negligent malpractice committed under a professional setting. The actions of Engelmann ceased to be covered under the policy when he became engaged in inherently harmful, intentionally unprofessional conduct outside the scope of his employment.

[¶ 38.] As much as the families in this case, and the women involved, deserve our sympathy and compassion, we cannot be swayed by those emotions. The Court must look to the law to determine who is responsible for the payment of the verdict. There is ample evidence that the State of South Dakota believes the person who commits intentionally injurious acts should be required to pay, not the insurer.

[¶ 39.] Doctors and medical clinics as well as many other professions, insure themselves every day against the possibility that they may make a mistake. That they failed to diagnose something properly, that they gave the wrong medicine, that they gave the wrong advice. Those possibilities are foreseen and reasonably insurable. One should not be able to insure against intentional malpractice.

MILLER, Retired Chief Justice (dissenting).

[¶ 41.] The majority ignores settled law and overrules our own recent holding in *Martinmaas, supra*. Therefore, I dissent.

[¶ 42.] The majority, without specifically saying so, is ignoring case precedent in this Court. In so doing, it violates the basic and honored concept of stare decisis. "Stare decisis is a ... doctrine that, when the court has laid down a principle of law as applicable to a certain state of facts, it will adhere to that principle, and apply it to all further cases where the facts are substantially the same." *State v. Means*, 268 N.W.2d 802, 811 (S.D.1978) (citing *Printup v. Kenner*, 43 S.D. 473, 476, 180 N.W. 512, 513 (1920)). Stare decisis provides parties with a "continuity of the law, rooted in a belief of reliance on how this Court has ruled in the past." *See Phipps Bros. Inc. v. Nelson's Oil and Gas, Inc.*, 508 N.W.2d 885, 891 (S.D.1993) (Henderson, J., concurring in part; dissenting in part). We have settled case law precedent before us, recently handed down by this Court, and we should abide by it. The majority (and the special writer, who obviously disagreed with our earlier holding and is using this appeal to overturn it) is compelled by this doctrine to adhere to our decision in *Martinmaas*. To do otherwise puts the law of this state in flux and it places the bench, bar and public in the dubious situation of not knowing from one case to the next what our law is. Our jurisprudence is not being well served.

[¶ 43.] In *Martinmaas*, we upheld the jury's verdict finding that Engelmann had committed professional negligence (medical malpractice) and awarding the Plaintiffs damages. *Martinmaas*, 2000 SD 85, ¶ 59, 612 N.W.2d 600. The trial was submitted to the jury based solely on negligence stemming from Engelmann's utilization of improper medical procedures, positions, methods and his improper sexual contact. *Id.* ¶ 4. The majority in this appeal now states that Engelmann's conduct was intentional, and thus it completely disregards the jury's verdict and our holding in *Martinmaas*. Thus, in addition violating stare decisis, it also clearly ignores the doctrine of collateral estoppel.

[¶ 44.] Collateral estoppel prevents parties or their privies from re-litigating issues previously litigated and adjudicated on the merits. *Shevling v. Butte County Bd. of Comm'rs*, 1999 SD 88, ¶ 22, 596 N.W.2d 728, 731. The application of collateral estoppel requires the satisfaction of four factors:

(1) [t]he issue decided in the prior adjudication was identical with the one presented in the action in question;

(2) [t]here was a final judgment on the merits;

(3) [t]he party against whom the plea is asserted was a party or in privity with a party to the prior adjudication; and

(4) [t]he party against whom the plea is asserted had a full and fair opportunity to litigate the issue in the prior adjudication.

*Grand State Property, Inc. v. Woods, Fuller, Shultz & Smith*, 1996 SD 139, ¶ 12, 556 N.W.2d 84, 87. Collateral estoppel must be applied under appropriate circumstances to maintain "judicial orderliness, economy of judicial time, and the interest of litigants as well as the peace and order of society...." *Frigaard v. Seffens*, 1999 SD 123, ¶ 16, 599 N.W.2d 646, 650. Judgments on prior issues must be accorded stability. *Id.* "Controversies once decided on their merits should remain in repose, and inconsistent judicial decisions should not be made on the same set of facts." *Id.*

[¶ 45.] Here, St. Paul brought a declaratory judgment action in an attempt to avoid indemnifying Engelmann under his medical malpractice insurance. St. Paul asserts that the conduct Plaintiffs proved in the *Martinmaas* trial is not covered by under either the CGL policy or the profes-

sional liability policy. It argues that Engelmann's conduct was not negligent but intentional. This is the exact issue that was litigated in *Martinmaas*. His counsel argued extensively at trial that Engelmann's conduct was intentional rather than negligent. The jury, deciding on the merits, obviously disagreed and found that Engelmann's procedures and methods fell below the appropriate standard of care, constituting professional negligence. This Court affirmed. (Further, it must be remembered that Engelmann was tried and acquitted of the allegations of criminal sexual acts. Thus, it is improper to treat an acquitted person as a convict in order to justify a result-oriented decision.)

[¶ 46.] The majority also blatantly disregards this Court's previous holding that if there are two theories for recovery and one is permissible based on the evidence and the other is not, we will give the prevailing party the benefit of the doubt and affirm based on the permissible theory. *Baker v. Jewell,* 77 S.D. 573, 580–81, 96 N.W.2d 299, 304 (S.D.1959); *Berg v. Sukup Mfg. Co.,* 355 N.W.2d 833, 837 (S.D. 1984) (Henderson, J., specially concurring).

[¶ 47.] Here we are presented with a decision on a rule of law, not a question for the jury. *Id.* The jury in *Martinmaas* was given two theories of recovery. As the majority acknowledges, one theory was permissible—Engelmann was covered under his professional liability policy. Yet the absurd result of the majority's decision is to send this case back to a *new* jury for it to determine the following: On which theory of recovery did the *Martinmaas* jury render its decision? Not only is this an impossible question for a new jury to answer, it is not one appropriate for them to decide.

[¶ 48.] Simply stated, St. Paul disagreed with the jury verdict in *Martinmaas*. It lost its appeal and is now seeking a declaratory judgment to have it reviewed again. Collateral estoppel clearly applies to prevent this type of religitation. The majority should not now overturn the jury verdict we previously affirmed. The jury found that Engelmann committed professional negligence. We affirmed and are bound by that decision. There is nothing more to litigate.

[¶ 49.] GILBERTSON, Chief Justice, joins this dissent.